CATHERINE S. WARINNER, Appellant, v. ANTHONY P. NUGENT, Respondent, No. 42111—240 S. W. (2d) 941.

Division Two, June 11, 1951.

Motion for Rehearing or to Transfer to Banc Overruled, July 9, 1951.

234

*Wm. G. Boatright* for appellant.

*Harry A. Hall* and *Anthony P. Nugent, Jr.*, for respondent.

236

 BARRETT, C.—In this action for $17,500 damages for breach of an oral contract the trial court directed a verdict for the defendant at the close of the plaintiff's evidence. Upon this appeal by the plaintiff the three questions so briefed and argued as to present issues necessary to a determination of the appeal are (1) whether, prima facie, the plaintiff's evidence was sufficient to prove the alleged oral contract and, therefore, should have been submitted to the jury; (2) whether her claim was barred by the statutes of limitation, and (3) whether the contract testified to by the plaintiff was usurious as a matter of law.

The facts and circumstances upon which the plaintiff relies as establishing the contract and, prima facie, her right to recovery are these: The plaintiff, Mrs. Catharine S. Warinner, a life insurance agent, and the defendant, Anthony P. Nugent, a lawyer, were casually acquainted. In August 1941 they met in front of an office building and, after some conversation, Mr. Nugent invited Mrs. Warinner to have a "coke" with him in Price's. As they talked and reminisced Mr. Nugent told her about his experiences in the depression and the fact that he had lost two fortunes. He told her about a lawsuit he then had from which he had "a chance to get well." He represented two Negro boys, the Mayweather brothers, who because of their Indian blood had a claim to valuable oil lands in Oklahoma but it looked as if he would lose the suit for lack of funds to finance himself. He said that he did not have the price of a hotel room or of train fare and that no one would loan him a dime. In the course of their talk Mr. Nugent learned that Mrs. Warinner had some stocks and he began by suggesting that she sell the stocks and loan him the proceeds. She had owned the stocks from five to eight years and had paid $4400 for them but in August 1941 their market value was but $1000. She told him that she could not afford to take a loss on the stocks and he said that if she would sell the stocks and loan him the money that she would make more than she would ever make in the stock market. She said that he painted a glamorous picture of his lawsuit and his chance to make money. Finally he said, "I am desperate for money. If you will cash this stock, whether I win this suit or not I will guarantee to you out of my future business that forty-four

hundred dollars you paid for this stock, whether I win or lose I will guarantee that to you, back to you, the forty-four hundred dollars. If I do win the suit, with my past experience in business losses, I will put this money into annuities." She told him that he had promised a lot but she would have to think it over and so they parted.

Thereafter he called her on the telephone two and three times a week and importuned her to sell the stock and guaranteed "more profit than your dividends would ever earn you on this stock." He promised to urge the Mayweather brothers to invest their money in annuities and finally he had her prepare for himself and wife a prospectus for a $100,000 annuity on their lives. Once he called and had her come to his office and meet the Mayweather brothers. On each occasion he would reiterate his promises and guarantees but she was undecided. "One day I thought I would and one day I thought I wouldn't." But finally, after his repeated promises and importuning, on November 13th, 1941, she sold her $4400 worth of stocks for $990.96 to which she added some dividends and loaned Mr. Nugent $1000. Two or three weeks after she had loaned him the $1000 he called and said that he had used the money and was again desperate. She told him that she could borrow $200 from her employer, the Union Central Life Insurance Company, and on January 9, 1942 she executed a note and borrowed that sum. He came to her office and got the check. On that occasion he told her employer about his financial experiences and his lawsuit and the fact that Mrs. Warinner was the only person who would come to his rescue and he repeated to Mr. Wilkin all that he had promised her.

In September 1942, about eight months after she had advanced the money, he called and asked her to come to his office. "He said he had fixed up a note and he thought it was a good thing to have, that we should have a note. I told him I wasn't interested in a note. I wasn't interested in any interest. I wanted him to live up to the things that he promised me. He said there was no interest entered into it at all. He said that is the way he wanted to do it. He drew the note and at the same time he gave me an assignment on a term policy he had with Occidental which later they notified me, though, had been lapsed for non-payment of premium." He retained possession of the note and after she read in the newspaper "Seven and a half million dollar suit granted" she went to his office to congratulate him on his victory. When she inquired what he got out of the suit he said, "Nobody knows what I made on this case, and as far as I am concerned will ever know." She said, "Well, you remember what you promised me, don't you, not once, twice, but many times, a guarantee of this forty-four hundred I paid for this stock, and promised me annuities." He said, "Oh, yes, that is the trouble with women, they remember too damn well things you tell them." On that occasion he told her he was going to pay something on the loan

and gave her a check for $300. He produced the note and she endorsed on the back of the note "Paid, $200.00 on this note 2-10-43 and interest to date."

In June 1943 he gave her a check for $1020 and she wrote over his signature on the note "Paid in full 6-9-43." On that occasion she said, "I don't want that check. That wasn't our agreement at all. You promised me a guarantee of my loss on the market." He said, "We are going to do it this way, and we will talk about the other later." Subsequently he called on the telephone and told her he was leaving for military service and would have a leave after thirty days or so "and when I come home we will get together and get this thing straightened out." He never called and this suit followed in November 1948.

The respondent points to the note, the payments endorsed on the note by the plaintiff and the assignment and release of the life insurance policy and insists that the trial court properly directed a verdict for him at the close of the plaintiff's evidence. The respondent's position is this: "If plaintiff proved anything, it was only a contemporaneous agreement which was merged in the only writing entered into between plaintiff and defendant, to-wit: a secured promissory note which was paid in full and collateral fully released." In short the respondent invokes the rule that "When a written contract shows on its face that it includes the entire agreement and expresses all the obligations assumed by the parties thereto * * * then in the absence of fraud or mistake parol evidence is not admissible to add to, vary, modify or contradict the terms of the written contract." J. B. Colt Co. v. Gregor, 328 Mo. 1216, 1225, 44 S. W. (2) 2, 6; 1 Restatement, Contracts, Secs. 237, 240. The difficulty with the respondent's argument is that it assumes the very question presented by the evidence. The question is whether the only fair and reasonable inference is that their entire oral agreement was integrated in the note and assigned life insurance policy. If not the respondent and the trial court misconceived ▮ and misapplied the parol evidence rule.

The parol evidence rule is not a rule of evidence but "of substantive law which, when applicable, defines the limits of a contract. It fixes the subject matter for interpretation, though not itself a rule of interpretation." As applied to contracts the parol evidence rule "assumes that there has been a legal act consisting of a promise or set of promises; it also assumes the integration of that act in a written memorial. It assumes the proper interpretation of a written memorial according to some standard which the law adopts; and these assumptions being made, excludes from consideration all other elements of the act though they might have been material had there been no integration in a written memorial. In other words, the written memorial, as interpreted by the law, is, for legal purposes, the sole

act of the parties in regard to the matter up to the time of integration. * * * The parol evidence rule does not apply to every contract of which there is written evidence, but 'only applies where the parties to an agreement reduce it to writing, and agree or intend that that writing shall be their agreement.' '' 3 Williston, Contracts, Secs. 631-633; 9 Wigmore, Evidence, Secs. 2400, 2430. Here, from the respondent's viewpoint, there are circumstances indicating that the agreement of the parties was integrated in the written evidence. But the inference of integration is not the undeniable, indubitable conclusion to be drawn from the plaintiff's evidence.

This is not a suit on the note and the written evidence does not, on its face, necessarily indicate that the writing was intended as the only agreement. J. B. Colt v. Gregor, supra. Mrs. Warinner admits the assignment and release of the insurance policy and her endorsements on the note. The note was executed and paid but Mrs. Warinner says that the note was not their agreement and there is no effort here to contradict the provisions or obligations of the note. Bank of Mountain View v. Winebrenner, 355 Mo. 79, 195 S. W. (2) 486. According to her their entire contract was oral and in addition to the loan of $1200 or the obligation expressed in the note there were other obligations, the guaranty of her stock losses and dividends and the promise to invest in annuities. Admitting or assuming the written evidence it is not necessarily improbable, under all the circumstances, that the parties would not simultaneously enter into an agreement partly oral and partly written. 3 Williston, Contracts, Secs. 638, 644, pp. 1833, 1853; Mitchell v. Philippi, 359 Mo. 754, 223 S. W. (2) 441. It does not indubitably appear from the plaintiff's evidence and the situation of the parties that Mrs. Warinner and Mr. Nugent intended the written evidence as the only memorial of their agreement. Annotation 70 A. L. R. 752. It was not for the court to say as a matter of law as the only permissible inference in all the circumstances that the parties integrated their agreement in the written evidence, or that the written evidence constituted and was intended as the contract between the parties. Life Association of America v. Cravens, 60 Mo. 388; Brown v. Bowen, 90 Mo. 184, 2 S. W. 398; Kunz v. Chouteau, (Mo. App.) 202 S. W. 443; Kelley v. Briggs, (Mo. App.) 223 S. W. 959.

Because the plaintiff testified that the defendant was to repay the loan of $1200, pay or make good the $3400 loss on the sale of her stock together with any dividends and invest the proceeds of his fee in annuities from which she was to receive the commission it is insisted that the agreement was usurious and unenforceable. Restatement, Contracts, Sec. 526. But again the question is one of purpose and intention. If the agreement was merely a device to evade the usury laws the transaction was usurious. On the other hand if the bargain was collateral to the loan and not a mere device to avoid

the law of usury the transaction was not usurious. There has been some division of opinion as to whether requiring the purchase of insurance in addition to a loan makes the transaction usurious. Annotations 105 A. L. R. 795; 21 A. L. R. 797. Here there was no agreement that the annuities were to be assigned as a security device. So far as appears the policy was to be for the benefit of the defendant and was to be issued to him at the same rates and upon the same conditions as to policyholders who were not also borrowers. In Snow v. Nye, 106 Mass. 413 and DeMoltke-Huitfeldt v. Garner & Co., 130 N. Y. S. 558 it was necessary for the lenders to sell securities or stocks before making the loans and the borrowers agreed, in addition to repaying the loans, to pay any possible increases in the value or market price of the stocks and securities and it was held that the agreements were not usurious. In Stevens v. Staples, 64 Minn. 3, 65 N. W. 959, in a similar situation, the court said, "If the agreement between plaintiff and defendant that plaintiff should indemnify defendant for his loss, in having to sacrifice his securities to get the money to loan to plaintiff, was not merely a device to evade the usury laws, then the loan is not usurious. But whether or not it is such a device cannot be determined as a question of law on this demurrer. It is a question of fact, to be determined on a trial, where the court can go behind the returns, and inquire into and ascertain the intent and motives of the parties." It is not necessary here to examine in detail each item and indicate whether it is or is not usurious. It is sufficient to indicate by illustration that the question of usury, as with the memorial of the contract itself, was not in all the circumstances for the court to declare as a matter of law. Cockle v. Flack, 93 U. S. 344, 23 L. Ed. 949; Stewart v. Boone County Tr. Co., 230 Mo. App. 120, 87 S. W. (2) 223.

██ The oral contract was executed in 1941 and this suit for damages for its breach was instituted in November 1948. It was admitted that Mr. Nugent entered the military service in September 1943 and was discharged on June 1, 1946. In 1945 and 1946, and possibly part of 1944, he was in England, Africa and Italy. The basis of his contention that the plaintiff's claim was barred by the five year statute of limitations (Mo. R. S. 1949, Sec. 516.120) is that the Soldiers' and Sailors' Civil Relief Act (50 U. S. C. A., Sec. 525) did not toll the running of the statute. He argues that one in the military service does not leave the state of his residence with the intention of changing his residence and that the plaintiff's suit could have been instituted, though not prosecuted, by serving some member of his family over the age of fifteen years or by attachment. Essentially his argument is that the Soldiers' and Sailors' Civil Relief Act is for the benefit of the person in the military service and may not be relied upon by anyone else as tolling the statutes of limitation. The act makes no such distinction but provides, Section 525, that "The

period of military service shall not be included in computing any period now or hereafter to be limited by any law, * * * for the bringing of any action * * * in any court * * * by or against any person in military service * * * ." Campbell v. Rockefeller, 134 Conn. 585, 59 Atl. (2) 524 was a suit on an oral contract. It was there held that the period of the defendant's military service must be deducted in determining the applicability of the statute of limitations to the plaintiff's cause of action on the oral contract. Falk v. Levy, 180 F. (2) 562 was a suit on usurious notes and the question was whether the original debt might be enforced. The court said, "The statute of limitations, which would, then, have run from April 28, 1941, was tolled while appellant served in the armed forces, from 1942 to 1946." Likewise here the period of the defendant's military service being deducted the plaintiff's cause of action was not barred by the five year statute of limitations.

The appellant, in her brief, makes this point: "It was competent for plaintiff to prove by defendant and by his books and records, including income tax returns, and by his client the amount of fee received in the Mayweather litigation." The respondent says that the trial court did not err in its refusal to admit the evidence because there was no claim for exemplary damages and no claim or proof of fraud or misrepresentation. We are thus asked to pass upon the admissibility of this evidence. But neither the plaintiff nor the defendant have seen fit to cite any authorities whatever in support of their contentions or to properly brief and argue the point and for the purposes of this appeal the question is deemed to have been abandoned. Crampton v. Osborn, 356 Mo. 125, 133, 201 S. W. (2) 336, 339; Persons v. Prudential Ins. Co. of Amer., (Mo.) 233 S. W. (2) 729, 731; Petty v. Kansas City Pub. Serv. Co., 355 Mo. 824, 829, 198 S. W. (2) 684, 685; Supreme Court Rule 1.08.

Because the court erred in directing a verdict for the defendant at the close of the plaintiff's evidence the judgment is reversed and the cause remanded. *Westhues* and *Bohling, CC.,* concur.

PER CURIAM:—The foregoing opinion by BARRETT, C., is adopted as the opinion of the court. All the judges concur.