**KANSAS CITY BRIDGE COMPANY,**
Respondent,

v.

**KANSAS CITY STRUCTURAL STEEL
COMPANY, Appellant.**

No. 46887.

Supreme Court of Missouri,

Division No. 1.

Nov. 10, 1958.

Lee Vaughan, Paul Barnett, Kansas City, for appellant.

Michael Bogutski, Lawrence R. Brown, Kansas City, for respondent, Stinson, Mag, Thomson, McEvers & Fizzell, Kansas City, of counsel.

COIL, Commissioner.

Plaintiff below received a judgment for $139,438.85, which it claimed as damages resulting from defendant's alleged breach of a contract which plaintiff had averred was partly written and partly oral, and by the terms of which defendant was to fabricate and furnish to plaintiff the steel required for the erection of the river spans— superstructure for the bridge spanning the Missouri River at Leavenworth, Kansas.

■ Defendant's first contention is that there was a contract in writing which was silent as to time of performance, and thus that the trial court erred in admitting evidence of a prior oral agreement between plaintiff and defendant as to a specific time for delivery of the steel (in so far as the purpose of the evidence was to prove the oral part of the contract alleged) for the reason that the oral agreement contradicted the terms of the written contract. Plaintiff's case was submitted on the sole theory that the contract was partly written and partly oral, including the oral agreement that defendant would begin to deliver the steel in time for plaintiff to commence erection of the bridge's river spans during July 1954 and would continue deliveries thereafter so that construction could proceed uninterruptedly to completion.

The City of Leavenworth advertised for bids on the bridge in accordance with detailed plans and specifications prepared by its consulting engineers. Plaintiff's evidence tended to show that after deciding to bid, but before bidding, on what was known as contract No. 2 (i. e., construction of the river spans as distinguished from contracts for each the east and west bridge approaches) in accordance with usual practice it discussed matters relating to steel fabrication and prices with defendant. After preliminary conversations, defendant, in November 1953, quoted approximate prices for the estimated quantities of steel required and at that time plaintiff pointed out to defendant that whoever received the bid would have to substantially complete it in the relatively short time stated in the proposed contract in order to avoid penalties therein also provided; and that, consequently, if plaintiff were the successful bidder, it would need the necessary steel in time to begin construction in the early part of July 1954 so that the steel would be erected in time to comply with the contract and also to avoid the increased costs which would result from pouring the concrete bridge roadway during cold weather rather than during early fall. Defendant's proper officer assured plaintiff that he could foresee no problem or difficulty in meeting such a proposed delivery date. Again, early in December, defendant's contracting engineer confirmed the prices that plaintiff was to use in its bid, and again the necessity of delivery in time to begin steel erection in early July was discussed, and defendant again assured plaintiff that he could foresee no problem in meeting such a delivery requirement.

Based upon the approximate prices quoted and upon defendant's statements which plaintiff construed to mean that defendant agreed to begin delivery of the necessary steel in time for construction to start in early July and to continue deliveries so that construction could proceed without interruption thereafter, plaintiff submitted a bid on December 15 and was awarded contract No. 2 on December 21, 1953. Under the terms of plaintiff's contract with Leavenworth, the bridge was to be substantially completed (i. e., open to traffic) on or before December 26, 1954.

Later in December 1953 or in early January 1954, the consulting engineers indicated a desire for a bid on substituted steel. Defendant's bid (through plaintiff) on such was accepted with the assurance to plaintiff

that the substituted steel could be furnished without change in the delivery picture. After defendant had begun its preliminary work preparatory to fabricating and furnishing the steel, it sent to plaintiff the following writing on defendant's stationery, headed "Proposal":

"Confirming our prices given you for your structural steel requirements for bridge over Missouri river at Leavenworth, Kansas, consisting of 2–420′ Continuous Arch Spans, known as Contract No. 2, we are pleased to quote as follows:

Item #1—Approx. 1,710,000 # Carbon Steel—$15.22 per 100 lbs.

Item #5A—Approx. 1,645,000 # Low Alloy Steel—$16.72 per 100 lbs.

"The above prices are f. o. b. cars Leavenworth, Kansas, and cover fabrication as per plans and specifications by Howard, Needles, Tammen & Bergendoff, Consulting Engineers.

"The above prices do not include sandblasting or shop coat of paint.

"This confirmation is rendered to you in duplicate, your signature of acceptance on one copy and the return of the same to us will constitute a contract between us."

Plaintiff's vice-president received the writing and, after finding that the proposed prices were in accord with those priorly discussed, directed the purchasing agent to accept on behalf of plaintiff and to attach a purchase order for the quantities of steel stated in the proposal at the prices there stated. The purchasing agent did as directed and, on January 12, returned to defendant the signed contract and plaintiff's purchase order.

Defendant contended at the trial and here contends that the portions of the evidence heretofore related, tending to show that there was an oral agreement as to a specific time for steel delivery, was not admissible as part of the contract between the parties for the reason that, inasmuch as the written contract of January 11, 1954,

above set forth, made no reference to time of performance, the law implied that it was to be performed in a reasonable time; and thus to show an oral agreement for a specific time contradicted the terms of the written contract.

Defendant conceded at the trial that the evidence heretofore mentioned was admissible as bearing upon the jury question of what was a reasonable time. The parties entered into a stipulation with reference to that matter and are here in dispute as to its effect. In the view we take of this case, however, it will be unnecessary to determine the effect of that stipulation. For our present purposes, it suffices to say that unless the evidence of a prior oral agreement as to time of performance was properly admitted as tending to prove the proposition that as part of the pleaded contract defendant agreed to deliver the steel in time to permit plaintiff to commence erection of the bridge by a specific date and to permit uninterrupted construction thereafter, plaintiff did not prove the contract which it alleged in its petition and submitted to the jury as the basis for its recovery, and, in that event, the result would be a reversal and remand of the case for a trial on the theory of whether the written contract was performed by defendant in a reasonable time.

Plaintiff contends that the evidence establishing the parol agreement as to time of performance was admissible under an exception to the so-called "parol evidence" rule to the effect that "even though a written instrument may be drawn in a form which is calculated to give it contractual effect, yet, if it discloses on its face that it is incomplete and does not purport to contain a full and complete expression of the entire contract of the parties, the parol evidence rule will not serve to foreclose its verbal enlargement, and oral evidence will be competent in the case to explain and supply the omissions." St. Louis Auto Parts & Salvage Co. v. Indiana Auto Salvage Co., Mo.App., 89 S.W.2d 134, 136. In none of the cases cited by plaintiff in support of the exception stated above is the

omitted provision in question, a time-of-performance provision.

Defendant relies on Baker v. J. W. Mc-Murry Contracting Co., 282 Mo. 685, 223 S.W. 45, 48 [3]. Before further reference to the Baker case, we note two cases not cited by either party; viz., Blake Mfg. Co. v. Jaeger, 81 Mo.App. 239, 242–243, and Metropolitan St. R. Co. v. Broderick & Bascom Rope Co., 156 Mo.App. 640, 137 S.W. 633, 635 [2].

In the Jaeger case the court said as to the admission of evidence of an oral agreement as to time of performance where a written agreement omitted any reference thereto: "In admitting the evidence that the pump was to be furnished within thirty days the trial court committed error. No time of delivery having been written in the contract, the law implies that it should be a reasonable time. This implication of the law is as much a part of the contract as if it was written therein in words. The contract was not incomplete. On the contrary it was a full expression of the entire understanding, and therefore falls within the rule which prevents the admission of oral evidence to vary or alter a written contract." 81 Mo.App. 242.

In the Broderick & Bascom case, supra, the same judge who wrote the Jaeger case said: "Where the contract is silent as to the time the article contracted for is to be put into service, a reasonable time will be implied, as much so as if written therein, and it is improper to admit evidence of a specific time being verbally agreed upon or intended. [Blake] Mfg. Co. v. Jaeger, 81 Mo.App. 239; Williams v. [Kansas City Suburban Belt] Ry. Co., 85 Mo.App. 103." 137 S.W. 635 [2].

While not so clearly, this court in the Baker case, supra, apparently applied the rule stated in the two cases above. In the Baker case a general contractor considered doing work for a railroad and inquired of the plaintiff, as a subcontractor, the terms and conditions upon which he would perform certain of the work and the time which would be required therefor. Subcontractor (plaintiff) informed defendant contractor that it would take four months. Thereafter, the general contractor.entered into a written contract with the railroad agreeing to perform all the work in four months, and entered into a contract with plaintiff providing that plaintiff would do the work and the price therefor, but omitting any reference to the time for performance. Defendant had the verdict and, on plaintiff's appeal, it was held that if plaintiff's oral statement that his part of the work would take four months was other than an expression of opinion, it "would have been superseded by the written instrument, which is subject to the rule as to a reasonable time rather than a specified period." 223 S.W. 48 [3]. The parties have not cited and we have not found any other Missouri case which deals with the precise problem presented, with the possible exception of J. B. Colt Co. v. Watson, 215 Mo.App. 467, 247 S.W. 493, 494. Other Missouri cases examined, having to do with time-of-performance provisions, involve contracts which are within the statute of frauds and, obviously, other considerations there control.

We have the opinion that the holdings in the Jaeger, Broderick, and Baker cases, supra, are out of harmony with the rule of partial integration as we have applied it to provisions of written contracts other than provisions for time of performance, and that the better rule, to be applied to the instant facts, should not require a conclusive presumption that the parties intended that their silence in the written contract as to time of performance, where that contract shows on its face that it is incomplete, was necessarily and in all events the same as though they had written into the contract that defendant was to have a reasonable time for performance, but, on the contrary, evidence of a prior oral agreement as to a specific time for performance should be admissible to rebut the presumption which would otherwise prevail.

We have referred to St. Louis Auto Parts & Salvage Co. v. Indiana Auto Salvage Co.,

supra, wherein evidence of a parol agreement was admitted to prove an alleged warranty of quantity and quality made by the defendant where the written agreement did not purport to contain the entire agreement. And see for other applications of the exception, Bagnall v. Frank Fehr Brewing Co., 203 Mo.App. 635, 221 S.W. 793 (warranty); Kingsland & Ferguson Mfg. Co. v. St. Louis Malleable Iron Co., 29 Mo.App. 526 (quantity); and Charles A. Liemke Co. v. Krekeler Grocer Co., 231 Mo.App. 169, 95 S.W.2d 820 (guaranty of validity of orders).

(In applying the exception to the parol evidence rule permitting evidence of a prior or contemporaneous oral agreement, where there is a written contract between the parties, it is usually stated that the written contract must show on its face that it is incomplete and does not purport to be a complete expression of the entire agreement. Koons v. St. Louis Car Co., 203 Mo. 227, 101 S.W. 49, 57. And see Grapette Co. v. Grapette Bottling Co., Mo.App., 286 S.W.2d 34, 39 [10–11], and Edwards v. Sittner, Mo.App., 213 S.W.2d 652, 656 [6, 7]. Cf., however, Warinner v. Nugent, 362 Mo. 233, 240 S.W.2d 941, 26 A.L.R.2d 278, indicating that the exception may be applicable where the written contract does not necessarily and as a matter of law show on its face that the writing therein was intended as a complete integration of the entire agreement of the parties. In any event, the instant contract, under which defendant was to fabricate and furnish to plaintiff the necessary steel to construct the tied arch spans of a bridge across the Missouri River, shows on its face that an important element thereof has been omitted, viz., the time for delivery of the steel, unless it is to be conclusively presumed that the parties intended that a reasonable-time provision be considered as having been written therein.)

It is true that states other than Missouri apply the rule stated in the Jaeger and Broderick cases, and it is said that such is the usual rule. 20 Am.Jur., Evidence, § 1120, p. 978; 32 C.J.S. Evidence § 853, p. 789. Cf. 32 C.J.S. Evidence § 1013 c (2), p. 1035. In Corbin on Contracts, Vol. 3, § 593, pp. 335–338, it is stated:

"In the making of contracts, the parties often express their agreement on several terms leaving some others unconsidered or, at least, unexpressed. This does not necessarily prevent the existence of an enforceable contract. For example, they may agree upon a sale of goods without specifying the time or place of delivery or the time of payment. The law will often supply such a gap by requiring delivery 'within a reasonable time' or payment 'on delivery.' In such cases, it is possible that the parties did so agree, without putting their agreement into words; but the result is the same even though the court is convinced that they did not think of the time or place element at all.

"Suppose, however, that the parties did in fact think of these matters and orally agreed upon a specific time for payment and a definite time and place for delivery of goods, making this oral agreement simultaneously with the execution of a writing that states all the other terms of the selling agreement. Does the 'parol evidence rule' prevent the enforcement of the oral agreement as to time and place, on the ground that it contradicts and varies a completely integrated written contract? The cases show that the courts have floundered and disagreed in answering this question. The answer should be No; the writing is only a partial integration.

"* * * By the weight of authority, supported by the better reason, oral testimony is admissible to prove that a time or place was agreed on and to rebut the usual presumptions and inferences that would otherwise prevail. The contrary is held in a smaller number of cases. Oral testimony admitted for this purpose is not varying or contradicting the writing; it is merely enabling the court to fill a gap by adding something that is not expressed in the writing at all. Nor is it the contradiction of a meaning found by interpretation or implication in fact. * * *.

"If the express words of a written agreement are that performance shall be within a reasonable time, any antecedent oral or written agreement fixing a specific time is superseded, and evidence to prove that agreement is immaterial. Even in such a case, however, the expressions and agreements of the parties, indicating what they thought a reasonable time to be, ought to be admitted.

"Even if the words of a written contract do not expressly fix a definite time or place (or a 'reasonable' time or place) for performance, it may be that the written words, when subjected to interpretation according to the usual rules thereof, show that the parties intended to fix such a time or place. When such is the case, the parties have expressly agreed and there is no gap to fill. Also, antecedent agreements, oral or written, are superseded."

The author of Williston on Contracts, Rev.Ed., Vol. 3, § 640, p. 1840, in criticizing the rule that where no time for performance is fixed in a written contract, the law fixes the time in accordance with certain rules irrespective of what the parties actually intended, states that "when an ordinary contract does not state the time for performance, and the parties orally agree on a particular time," the legal implication that they intended a reasonable time is an implication "fictitiously invented by the law."

The Restatement of the Law, Contracts, § 240, p. 339, illus. 4, is: "A and B in an integrated contract respectively promise to sell and to buy specified goods. No time or place for delivery is specified. If no agreement is made as to these matters the rule of law is that the goods are deliverable in a reasonable time at the seller's place of business. *A contemporaneous oral agreement that the goods shall be delivered within thirty days, at the buyer's place of business, is operative.*" (Our italics.) And see Comment on Subsection (1b) of Section 240, p. 337.

Some of the cases from other jurisdictions which support the rule said to be the better rule are cited in Corbin on Contracts, supra, footnote 87, p. 336.

We think the evidence in the instant case clearly demonstrates the desirability in this case of permitting oral evidence to rebut the presumption that the parties to a written contract intended that the time of performance not mentioned therein was to be a reasonable time. In the present case there was little disagreement between the respective officials of plaintiff and defendant about the subject matter of the conversations relating to the time for the steel deliveries. It is true that defendant's officers did not recall all of the conversations testified to by plaintiff's representatives, and it is true that defendant did not and does not admit that the conversations shown in evidence are correctly construable as constituting an oral contract for a definite time of performance. But defendant does not contend on this appeal that, if those conversations were admissible, they did not constitute substantial evidence sufficient to make a jury issue as to whether there was an oral contract for a specific time of performance.

And, as noted, there was very little dispute between the parties as to the essential substance of those conversations. That is to say, defendant admitted that it knew about plaintiff's contract with the City of Leavenworth, including the provision as to the time within which plaintiff was to complete the bridge, and admitted the conversations, or some of them, with respect to plaintiff's inquiries and defendant's answers about defendant being able to meet a steel delivery schedule which would enable plaintiff to begin construction during July and to continue uninterruptedly thereafter. Now, if it was proper for the jury to find from that testimony (and defendant does not contend that it was not, provided the testimony was admissible) that plaintiff and defendant did in fact agree as to a specific time of performance, then it would seem entirely fictitious and unjust to say, as a matter of law and in direct contradiction of the fact, that the parties did not agree on a specific time but intended to and did leave the time-of-performance provision to be supplied by a conclusive nonrebuttable legal presumption of

a reasonable time. A rule which, in this case, would prohibit the jury from considering the testimony concerning the prior oral agreement as to time of performance and to determine therefrom whether that prior oral agreement was in fact made and, if so, whether it was in fact a part of the total contract between the parties, would, it seems to us, prevent the jury from considering evidence which should be considered by it in deciding the rights of the parties under all the evidence.

Under the facts here we are unwilling to hold that this case should be reversed and remanded for a new trial because of the rule heretofore discussed. We think its application to the present facts would, in effect, preclude the jury from finding what it believed to be, and reasonably could have believed to be, the truth. Cases which would require a different holding under the facts of the instant case, should no longer be followed.

■ Plaintiff's damage instruction authorized the jury to assess as damages the amount it found was the natural and probable result of the delay in delivery of the steel and as was reasonably within the contemplation of the parties at the time of the contract and in determining that amount authorized the jury to take into account the liquidated damages which were assessed by the City of Leavenworth in accordance with the terms of its contract with plaintiff not to exceed $32,550; additional and indirect labor costs and expense incurred not to exceed $40,148.11; "additional overhead costs allocable to the bridge project" not to exceed $39,932.06; additional sums plaintiff paid to its subcontractor for constructing the concrete deck on the bridge and for materials and supplies furnished by plaintiff for the accomplishment thereof not to exceed $74,606.-79; and the damage resulting to plaintiff as a result of loss and damage to its falsework (wood construction supporting the steel of the bridge until the bridge became self-supporting) not to exceed $16,-549.87. The total of the maximum

amounts of those items was $203,786.83. By agreement the jury was instructed to deduct from any amount it awarded plaintiff, the sum of $64,347.98 which plaintiff admittedly owed defendant as the balance of the total contract price of the steel. The jury's verdict was $139,438.85. It is thus apparent that the jury found the maximum amount of each damage item submitted for its consideration.

Defendant contends that the item in the instruction labeled "additional overhead costs" and referred to in plaintiff's exhibit detailing that item as General and Administrative Extended Company Overhead, was improperly included in the damage instruction because plaintiff failed to adduce sufficient evidence to show that such was an item of damage. The parties agree that the item in question represented the portion of general fixed overhead of plaintiff company which was allocated to the Leavenworth project during the period from the date the bridge was required to be completed under the contract (December 26, 1954) to the date of its substantial completion (March 29, 1955) and thereafter until November 22, 1955, the date when all matters pertaining to the project had been finally completed and adjusted.

It is clear from the testimony that the type of overhead which is involved includes only fixed expense items, such as officers' and employees' salaries, rental payments for company offices, utilities, etc., and that all of the charges included in the item we are discussing were fixed and invariable in the sense that they did not increase or decrease by reason of the existence of the Leavenworth bridge job or the time of its completion and without respect to whether the total fixed overhead increased or decreased on account of the delay in that job. Any items of overhead which were not fixed, in the sense that they accrued only because of delay in completing the Leavenworth job, were included in the other damage item submitted, i. e., "additional direct and indirect labor costs and

expenses incurred by reason of the delay on the bridge job."

By certain mathematical calculations plaintiff arrived at the asserted fact that the Leavenworth job's daily share of total company overhead was $341.88. Thus, inasmuch as the job continued for 93 days beyond the date when it would have been completed but for defendant's delay in furnishing steel to the date of substantial completion (i. e., open to traffic), there was $31,794.84 fixed overhead allocable to the job for that period, and because many things connected with the bridge job required additional attention thereafter for a long period, one tenth of the total daily allocable overhead was charged each day for about 238 days for a total of $8,137.22. Consequently, the total fixed overhead allocated to the Leavenworth job during the delay period was $39,932.06.

In the view we take, we are not particularly concerned with the method used to compute the daily overhead allocable to the job or with the total amount of general and administrative overhead allocated to the job during the period of time the job was delayed due to defendant's breach of contract. The method used and the amounts arrived at seem sound and correct approximations and we do not understand that defendant questions the method or amount. For present purposes, however, we shall assume that $39,932.06 represents the proper portion of plaintiff's total general and administrative overhead allocable to the Leavenworth bridge job from December 27, 1954, to November 22, 1955, and we shall further assume, without deciding, that it was proper to charge that amount on its books as a part of the total *expense* involved in completing the bridge.

As we see it, however, prerequisite to plaintiff's recovery of this general overhead item as part of its damages, some evidence was essential from which the jury reasonably could have found that such general overhead was not only an *expense* but also represented a *loss* to plaintiff. That must be true, because it would seem

that plaintiff suffered no *loss,* no *damage,* because of the fact that this general fixed overhead expense continued during the period of delayed construction unless the plaintiff's services or abilities represented by the percentage of fixed overhead so allocated to the Leavenworth job would have been applied to work (i. e., jobs) which plaintiff forewent bidding on and probably obtaining because it was unable to accomplish such work or jobs by reason of the delay in the Leavenworth job. As noted, all of the items with which we are here dealing were fixed and, thus, plaintiff's total overhead was exactly the same whether there had been any delay in the Leavenworth job and exactly the same during the period of delay and exactly the same thereafter. Consequently, even though a percentage of that fixed overhead was properly allocable to the Leavenworth job during the period of delay, nevertheless any amount so allocated could not represent a *loss* or *damage* to plaintiff unless plaintiff would have, but for the delay, obtained other work (which it did not have or which it did not in fact obtain) sufficient in amount to have absorbed the allocated portion of general overhead.

We set forth the substance of plaintiff's evidence which could be said to relate to the essential evidence we have discussed above. Plaintiff's vice-president and project manager in direct charge of the construction of the bridge, testified that but for the delay in the completion of the bridge, plaintiff would have been "using its men and offices" for other work. As an example, the witness said that the falsework (destroyed as hereinafter detailed) had been scheduled for a bridge across the Kaw River at the very time it was lost. He further said that the "same thing" applied with respect to the equipment, the supervisory force, and the office personnel, i. e., "they could have been working on something else."

Another witness, plaintiff's vice-president and treasurer, testified that as long as the Leavenworth bridge job continued, "we

had no opportunity to utilize our resources, our equipment, and personnel on other jobs * * * We thought we could use our abilities on other projects which would bring income in to pay this overhead." The witness presumed, however, that during the delay in question, plaintiff did bid on new jobs and worked on others which overlapped at one stage or another. The witness said he could not say that plaintiff did not refuse to bid on any job it thought was profitable on account of having the Leavenworth job.

These were questions and answers on cross-examination:

"You don't know of any time that the president didn't have time to look after other business on account of this job, do you?

"I think it is quite fair to say it would have affected our ability to bid on other jobs because the equipment that was tied up and the personnel that was tied up on this Leavenworth job, we have to take that into account.

"You have no way to know what it would amount to, have you?

"You can't tie it right down to specific fact."

The foregoing testimony adduced by plaintiff was insufficient in our judgment to furnish a basis for a reasonable conclusion that the overhead allocated during the delay period was in fact a loss to plaintiff. No witness testified, and it was not otherwise shown, that there were any jobs available for bidding during the period December 27, 1954, to November 22, 1955. Plaintiff, as its name implies and as the evidence shows, is "In the general field of heavy construction with particular reference to railroad and highway bridges." Now, while it may well be that in any period covering eleven months or more some projects within plaintiff's general field are advertised for bids, yet we do not judicially so know, nor do we think such is in the realm of common knowledge. Even

if, however, we judicially noticed that some such jobs must have been advertised during the period in question, still there was no evidence to indicate or suggest their size or that plaintiff would have wished to have bid on those jobs, irrespective of the delay on the Leavenworth job. There is likewise no evidence supporting a reasonable inference that plaintiff did in fact forego bidding on a job or jobs during the delay period, or, if so, the probability of plaintiff obtaining such job or jobs, or whether they would have been of sufficient stature to have absorbed the overhead allocated to the Leavenworth job during the period of delay, or that their reason for not so bidding was because of their lack of ability (resources) to accomplish such due to the tie-up of equipment and personnel on the Leavenworth job.

It is true, as the summary of testimony shows, that plaintiff's ability to accomplish other jobs was affected by the personnel and equipment tie-up at the Leavenworth job, but in so far as plaintiff was damaged by reason of equipment and personnel being used on the Leavenworth job rather than on other jobs which plaintiff had, compensation therefor was awarded under the item labeled "additional direct and indirect labor, costs, and expenses," which item included additional cost of steel erection, additional cost of lost time due to weather, indirect labor expense, equipment ownership expense, fuel, utilities, and field office expense, totaling $40,148.11.

The parties have cited cases in support of their respective positions on this question. Plaintiff relies chiefly on Gulf States Creosoting Co. v. Loving, 4 Cir., 120 F.2d 195, 203 [14, 15], and Grand Trunk Western R. Co. v. H. W. Nelson Co., 6 Cir., 116 F.2d 823, 839 [58, 59]. Those, as well as others cited from the United States Court of Claims, typical of which is Brand Inv. Co. v. United States, 58 F.Supp. 749, 751, 102 Ct.Cl. 40, 44, support plaintiff's contention that a proper portion of a constructor's general overhead expense is an allowable item of damages where a de-

lay in construction has been caused by a breach of contract by reason of a wrongful delay in the delivery of material. None of the cases cited, however, contain any discussion of the reasoning on which that result is reached, nor do those cases indicate whether the evidence in them supplied the proof necessary to show that the overhead in question was in fact a loss as well as an expense.

Defendant cites cases which it contends demonstrate that expenses, incurred as general overhead, which remain constant and do not increase or decrease by reason of the delay in performance of a contract, are not allowable items of damage. All are distinguishable and none, in our judgment are applicable to the precise question here presented. We find no Missouri case which is specifically helpful.

We have the opinion that there was insufficient evidence to support a reasonable finding that the overhead item in question constituted a loss to plaintiff and, for that reason, the item of $39,932.06 was improperly awarded plaintiff as damages.

Defendant next contends that the trial court improperly submitted the item labeled in the damage instruction, "additional sums plaintiff paid to M. E. Gillioz in excess of the subcontract price for the concrete deck of the bridge" etc., not to exceed $74,606.79. Plaintiff claimed $69,703.25 of that amount as an additional sum paid Gillioz and the remaining $4,903.54 as the cost of additional materials and supplies furnished him, by reason of the delay in steel delivery.

Defendant asserts that any additional sums paid to the subcontractor and the cost of additional materials and supplies furnished him were not the result of any delay in the delivery of steel because plaintiff could have insisted upon performance by Gillioz under its original contract with him despite the date of steel delivery, and defendant says that in any event the additional payments to Gillioz for concrete

work reasonably could not have been damages within the contemplation of the parties at the time of their contract.

The written contract between plaintiff and defendant was executed January 12, 1954, and a contract between plaintiff and Gillioz for the placing of concrete on the east approach (contract No. 2B which plaintiff also had, the steel for which was furnished by a company other than defendant) and the two river spans (contract No. 2) was dated February 9, 1954. Plaintiff's contract with Gillioz provided, inter alia, that "The Contractor expects to have the structural steel ready for commencing the deck construction by September 15, 1954," and that the work under the subcontract would proceed as expeditiously as operations permitted and would be completed within 90 days of the date notice was given to commence the work.

The structural steel needed to begin erection of the river spans was not delivered by defendant until September 21 and, due to unloading and sorting (and to a short delay not claimed to be defendant's fault), construction was not begun until October 12, 1954. Subcontractor Gillioz moved in to begin performance of his contract on September 21 but was unable to continue uninterruptedly because plaintiff had just then received the steel for construction of the river spans; and the pouring of the concrete on the east approach could not be completed at that time because plaintiff was using a guy derrick and a steam hoist with which to erect the steel of the river spans and the derrick and hoist were placed on the east approach and were moved forward as the erection of steel permitted.

On September 29, 1954, subcontractor Gillioz wrote plaintiff calling attention to the fact that under the contract he was to begin work September 15 and to complete his portion of the work in 90 days, that he had started on September 21 with a small crew but that it was not reasonable to anticipate that the progress would be

such as to permit his finishing in the 90 days provided in his contract, and that the 90-days' time provision contemplated that the concrete would be poured in relatively warm weather, thus making it unnecessary to engage in the expensive process of heating the concrete in accordance with the requirements of plaintiff's contract with the City of Leavenworth, and asked for plaintiff's cooperation in permitting them to get into full swing with the concrete work. Again on November 19, 1954, subcontractor Gillioz wrote plaintiff calling attention to the fact that he had been promised that all the approaches would be cleared and ready for the pouring of concrete in early November, but that the progress of steel erection was such that it appeared it would be necessary to close the job during the winter months and to complete the concrete work the following spring. As a result of those letters, meetings were had which resulted in a new arrangement between plaintiff and Gillioz whereby Gillioz agreed to proceed with the concrete work through the winter months in order to have the bridge ready for traffic at the earliest date possible and the entire subcontract for the concrete work was to be handled as a "force account," i. e., a cost-plus arrangement whereby the subcontractor would receive his actual cost plus 15 per cent for overhead and profit.

The parties proceeded under that arrangement and, upon completion of his subcontract and after negotiations, Gillioz reduced the amount due and settled for $69,703.25 in excess of the price for the work provided in the original contract. As indicated, the other $4,903.54 of the item involved was the cost of additional materials and supplies furnished by plaintiff to the subcontractor used in the completion of the concrete work.

Defendant contends that because plaintiff's contract with Gillioz provided that plaintiff *expected* to have the structural steel sufficiently erected so that Gillioz could commence his concrete work on September 15, the contract thereby did not bind plaintiff to do so and that, under other terms of the contract, Gillioz had to perform irrespective of any delays that occurred from any cause. We think that position is not well taken. It is true that the language of the subcontract was that the "Contractor expects to have the structural steel ready" so that Gillioz could commence on September 15 and, thus, plaintiff did not agree in so many words that September 15 was to be the date of notice to commence work, nevertheless, we think the jury reasonably could have found from the evidence that plaintiff and Gillioz intended by their contract to provide that the subcontractor would begin work on or about September 15, 1954, and that the price agreed upon by the subcontractor contemplated that he would have time to pour the concrete prior to cold weather.

Defendant next suggests that any delay in concrete work was not due to delay in steel delivery but to plaintiff's method of using a steam hoist and guy derrick which partially blocked the east bridge approach and prevented completion of the concrete work on that approach, rather than using a crawler crane which would have left the entire east bridge approach open and thereby would have avoided delay in pouring concrete thereon. Plaintiff's evidence showed, however, that its construction methods were proper and that, but for the delay in steel delivery, the concrete work would have been finished within 90 days after September 15, irrespective of the presence of the hoist and derrick on the east approach. Furthermore, defendant's present point is, in reality, a contention that plaintiff failed to avoid the incurring of damages by using reasonably available construction methods. Defendant submitted that contention to the jury. Instruction 9 submitted that if the additional payments to Gillioz (here in question) were the result of the interference with the progress of his concrete work by plaintiff using a guy derrick on the east approach of the bridge when the plaintiff could have used other means which would not have

interfered with the work, then plaintiff was not to be allowed damages for any extra payment to Gillioz.

Defendant's position with respect to the damage item in question on which it places chief reliance is that any additional payments made to Gillioz by plaintiff on account of its cost-plus arrangement were in the nature of special damages not within the contemplation of the parties at the time of the contract. There is no dispute about the general rule for which defendant contends, viz., that compensation is given only for those injuries which defendant had reason to foresee when the contract was made as a probable result of his breach, and that if the injury follows the breach in the usual course of events, there is reason for defendant to have foreseen it, but otherwise it must be shown specifically that defendant had reason to foresee the injury. Rest., Contracts, § 330, p. 509; Missouri cases cited in Mo.Anno. to Rest., § 330, pp. 199, 200. It is true, as defendant contends, that it could not have known at the time of executing its contract with plaintiff of the provisions of the contract which plaintiff later had with its concrete subcontractor because the latter was not then in existence. But the evidence with respect to the negotiations between plaintiff and defendant, prior to entering into their written contract, was such that the jury reasonably could have found, as it apparently did, that defendant knew or should have known, that plaintiff wanted the steel to build the Leavenworth bridge and knew of the requirements contained in the contract between plaintiff and the City of Leavenworth; that defendant knew that there were detailed requirements in plaintiff's contract with the city for the placing and maintaining of newly poured concrete at specific low temperatures, and knew that the process so provided was costly; that defendant knew or should have known that by delivering the steel at the time agreed, if the jury found such an agreement, the concrete could have been poured in all likelihood without the necessity of any heat-

ing thereof, and knew that plaintiff's concrete work costs were estimated on a basis that contemplated completing the concrete work without the necessity of heating. In short, there is no question but that the jury reasonably could have found from the evidence that defendant had reason to know facts which should have caused it to have foreseen that it was probable that its breach of contract as to time of steel delivery would result in additional costs and expenses being incurred for the placing of the concrete in the bridge structure. And the jury was required to find that plaintiff's damages "should reasonably have been within the contemplation of the parties at the time they entered into the contract for the furnishing of steel by defendant to plaintiff."

We hold that the item of $74,606.79 was properly included in the damage instruction and properly part of the jury's award.

■ Defendant's final contention is that the damage item labeled "damage to * * * falsework" not to exceed $16,549.87 was erroneously submitted. Falsework is a wood scaffold-like structure to support the respective portions of the bridge until they become self-supporting. Certain falsework remained under both the east and west spans on February 19, 1955, when a sudden release of a tremendous amount of water and ice due to the breaking of an upriver ice jam caused the loss of the falsework and some hydraulic jacks which had been placed thereon, which resulted in damage to plaintiff in the amount noted.

Plaintiff's evidence was that while the falsework was not being used on the date it was washed away, it had been impossible to remove it ever since the need for it had ended because of a combination of insufficient water in the river and the location of a particular sand bar. Plaintiff's evidence was further that late in each winter (except in mild winters) the Missouri River in the area in question is low because of an upstream ice jam and that near the

end of February or early in March in each such year, the ice jam breaks and releases water and chunks of ice which wash away everything of a temporary nature in the water's path.

The sole question, as we see it, with respect to this item of claimed damages is whether there was evidence from which a jury reasonably could have found that the damage due to loss of falsework was the result of foreseeable weather conditions and, if so, whether such damages were or should have been within the contemplation of the parties at the time of contracting.

We have set forth above the substance of all the evidence with respect to the seasonal river conditions which brought about the loss of plaintiff's falsework. That evidence, we think, was sufficient to support a reasonable conclusion that the weather conditions which caused the loss of plaintiff's falsework were reasonably foreseeable by those who for one reason or another should have been aware of those matters. By the same token, however, it seems to us abundantly clear that the evidence was not sufficient to furnish the basis for a reasonable finding that defendant, a steel fabricator, did or should have had knowledge of such usual weather conditions and their effect on temporary structures in the Missouri River, or that defendant did or at contract time should have had in contemplation damage to plaintiff which would ensue because of river conditions if there was a delay in the delivery of steel. Certainly, there was no showing that defendant, through its agents, had any actual knowledge of this usual action of ice jams in the Missouri River at particular dates during a winter, and certainly there was nothing developed in the evidence concerning the steel fabrication business which would permit a reasonable finding that defendant, because of its type of business, should have so known.

Upon the application of the same principle of the law of damages under which we held that the amount of additional payments to subcontractor Gillioz was properly submitted to the jury as allowable damages, we hold plaintiff's damage resulting from the loss of its falsework was improperly submitted and allowed.

It follows from all the foregoing that if, within 15 days of the filing of this opinion, plaintiff will enter here a remittitur of $56,481.93, the judgment will stand affirmed in the sum of $82,956.92 as of the date of the original judgment. Otherwise, the judgment will be reversed and the case remanded for a new trial.

VAN OSDOL and HOLMAN, CC., concur.

PER CURIAM.

The foregoing opinion by COIL, C., is adopted as the opinion of the court.

All concur.