385 F.2d 13
 GENERAL INSURANCE COMPANY OF AMERICA, Appellant,
v.
HERCULES CONSTRUCTION COMPANY, a corporation, Appellee.
HERCULES CONSTRUCTION COMPANY, a corporation, Appellant,
v.
GENERAL INSURANCE COMPANY OF AMERICA, Appellee.
 No. 18,496-97.
 United States Court of Appeals Eighth Circuit.
 Oct. 24, 1967, As Modified on Denial of Rehearing Dec. 1, 1967.
 
 Tyree C. Derrick, St. Louis, Mo., for General Insurance Co.; Karl E. Holderle, Jr., St. Louis, Mo., was with Tyree C. Derrick, St. Louis, Mo., on the brief.
 Mortimer A. Rosecan, St. Louis, Mo., and merle L. Silverstein, Rosenblum & Goldenhersh, St. Louis, Mo., made argument for Hercules Construction Co. and filed brief.
 Before VOGEL, Chief Judge, VAN OOSTERHOUT and GIBSON, Circuit Judges.
 GIBSON, Circuit Judge.
 
 
 1
 This is an appeal from the United States District Court for the Eastern District of Missouri on a judgment entered against General Insurance Company as surety on a subcontractor's performance bond, and a cross-appeal on the District Court's refusal to allow prejudgment interest. We will first consider the appeal of General Insurance Company.
 
 
 2
 Plaintiff-Appellee, Hercules Construction Company, entered into a general construction contract to erect a parking structure for The May Company, owner. Hercules subcontracted with Missouri Pres-Crete, inc., to design, re-design, fabricate and deliver all necessary precast concrete components for the structure. Defendant-Appellant, General Insurance Company of America, guaranteed performance by Missouri Pres-Crete, Inc.
 
 
 3
 In the suit between Hercules and General, Missouri Pres-Crete was allowed to intervene. However, Hercules did not amend its complaint to include missouri Pres-Crete as a party defendant. The issues were tried by a jury who returned a verdict in favor of Hercules against General for $117,5000.00. No Judgment was sought or given against the intervenor, Missouri Pres-Crete.
 
 
 4
 On November 29, 1961, Hercules contracted with The May Company to construct a parking structure adjacent to the Famous-Barr department store (owned by The May Company) on Pine Street between 6th and 7th Streets in St. Louis, Missouri. Hercules was required to give a performance bond to The May Company, which required completion of the parking structure by August 8, 1962. Hercules signed a subcontract with Pres-Crete on November 29, 1961, whereby Pres-Crete agreed to supply Hercules with custom precast concrete components, which were to comprise a substantial portion of the parking structure. Hercules required a performance bond from Pres-Crete, on which General was surety, to guarantee compliance by Pres-Crete with its subcontract.
 
 
 5
 Three essential features of the subcontract are relevant to this appeal. First, the subcontract expressly provided that time was of the essence. The subcontract specifically directed Pres-Crete's attention to the fact that the target date for completion of the entire project was August 1, 1962, and that completion of the project was contingent upon adherence to the program schedule for the phase of the work covered by the subcontract. Second, delivery of the precast components was to commence on approximately January 2, 1962, and was to be completed on approximately April 15, 1962, unless mutually agreed otherwise later. Third, delivery of the precast was to be in the sequence directed by Hercules' erection superintendent.
 
 
 6
 Hercules alleged that Pres-Crete breached the subcontract. Hercules' evidence showed that the first delivery of precast for erection purposes was not made until February 12, 1962, over one month after the date called for in the subcontract. The final delivery of precast by Pres-Crete was not made until September 1, 1962, about four and one-half months after the date called for by the subcontract. The precast components were not delivered in sequence, and until about May 6, 1962, approximately twentyfive percent of the major components[1] delivered were miscast or defectively engineered. Hercules did not complete the parking structure until October 8, 1962, two months past the time for completion called for in the contract with The May Company.
 
 
 7
 The May company, however, accepted the completed parking structure from Hercules and did not penalize Hercules for late completion. Thus, Hercules did not claim damages resulting from a breach of the contract between Hercules and The May Company as a consequence of Pres-Crete's breaching the subcontract between Hercules and Pres-Crete. Hercules did claim damages as a result of Pres-Crete's breach with regard to five areas of extra costs incurred in an attempt to complete the parking structure as nearly as possible to the contracted completion date. The following additional costs were alleged to have been incurred by Hercules in an attempt to minimize its possible liability to The May Company:
 
 
 8
 1. Extra erection labor costs .............. $ 10,370.00
2. Extra erection equipment costs ............ 21,613.00
3. Paid out for premium time after May 1 ..... 66,685.12
4. Extra cost of constructing downramp ....... 35,079.03
5. Extra costs of keeping the job open ....... 23,775.20
 -----------
 Total of extra costs paid out ........... $157,522.35
 
 
 9
 Hercules' evidence showed that from the time Pres-Crete began delivering the precast until May 7, it had to incur extra labor and equipment costs as set forth in items 1 and 2 above. After May 7 the workmanship and sequence of delivery showed a marked improvement. Efficient precast erection depends upon receipt of components properly fabricated and engineered and delivered in the sequence that erection is planned. Otherwise, slow and inefficient construction results, with costly delays occurring while the project awaits the proper component to fit in the architectural scheme of construction. The extra labor and equipment costs were shouldered by Hercules in an attempt to speed up construction progress, as Hercules was bound to do under its contract with The May Company.[2]
 
 
 10
 Item 3 is the amount of premium time (overtime) paid out by Hercules after May 1, 1962, over and above the amount it expected to pay for that purpose, necessarily incurred because of Pres-Crete's alleged breach.
 
 
 11
 Item 4 relates to Hercules' claimed extra expense in constructing the downramp that provides egress from the parking structure. The plan of construction called for equipment and materials to be moved across each floor of the essentially precast concrete structure to the corresponding level of the downramp that was to be constructed. Due to the delay in completing the precast erection, the parking structure could not be utilized to construct the poured-in-place downramp. Equipment and materials had to be hoisted by crane and the concrete poured bucket by bucket instead of being hoisted to each garage floor and then buggied over to the downramp. Extra labor and equipment expenses raised the cost of constructing the downramp considerably over that anticipated by Hercules.
 
 
 12
 Item 5 concerns Hercules' claimed damages resulting from keeping the job open until October 8, 1962, about two months after the date called for completion by its contract with The May Company. Such expenses included an allocation of Hercules' fixed overhead expenses for the additional two months, in addition to actual job-site costs as general equipment, hauling, temporary power facilities and supervisory personnel that could have been utilized on other jobs.
 
 
 13
 Hercules claimed total damages against General Insurance as the result of Pres-Crete's breach of contract in the amount of $157,522.35. The Jury returned a verdict in favor of Hercules in the amount of $117,500.00.
 
 
 14
 General first contends that because the liability of a surety is derivative and predicated on the liability of its principal, the verdict and judgment against it cannot stand because there has been no determination against its principal Pres-Crete. As Pres-Crete had intervened, General argues, the judgment had to be jointly against both principal and surety, rather than against the surety alone. We think not.
 
 
 15
 This diversity case is governed by Missouri law. The subcontract bond between General, as surety, and Pres-Crete as principal, provided that the surety and principal were jointly and severally liable. Where liability is joint and several, suit may be brought against both principal and surety or either separately. Board of Education of City of St. Louis v. United States Fidelity and Guaranty Co., 166 Mo.App. 410, 149 S.W. 46 (Mo.App.1912); see 72 C.J.S. Principal & Surety, 264(b). In Bolivar Reorg. School Dist. v. American Surety Company of New York, 307 S.W.2d 405, 70 A.L.R.2d 1361 (Mo.1957), an action against the surety alone was entertained with no question raised as to the necessity of joining the principal.
 
 
 16
 Although Pres-Crete was allowed to intervene as a party defendant, Hercules did not amend its petition to seek damages against Pres-Crete, as this would pose a jurisdictional question on the diversity aspect of Hercules' complaint, but chose to press its claim for damages against the several liability of the surety only. An intervenor accepts the pleadings as he finds them. In re V-I-D, Inc., 177 F.2d 234 (7 Cir. 1949). Pres-Crete's intervention did not affect the acknowledged jurisdiction of the court, nor did it change Hercules' claim to an action against the surety and the intervening principal. General still has a right of action against its principal, Pres-Crete, and could have cross-claimed against Pres-Crete in the present suit under Rule 13(g), Federal Rules of Civil Procedure. This it did not see fit to do.
 
 
 17
 General next asserts that the trial court erred in not sustaining its Motion to Dismiss Hercules' case because the evidence showed substantial compliance by Pres-Crete with the terms of the subcontract. It contends that all of the precast components were eventually delivered to Hercules, the parking structure was completed according to specifications, and no penalty for delay was charged by The May Company against Hercules. Further, General argues that any delay in delivering precast by Pres-Crete did not amount to a material breach of the subcontract, because any delay was due, at least in part, to Hercules making it impossible for Pres-Crete to perform on the dates specified, and in any case, the original contract was modified by subsequent dealings between Pres-Crete and Hercules, such modified contract being substantially complied with by Pres-Crete.
 
 
 18
 The trial court was correct in hot sustaining General's Motion to Dismiss. Its argument that the parking structure was ultimately completed and accepted by The May Company without penalty to Hercules is irrelevant. The thrust of Hercules' claim is that Pres-Crete's non-compliance with the subcontract damaged Hercules in its effort to complete the parking structure within the time limit set by the contract between Hercules and The May Company.
 
 
 19
 There is little doubt that time was of the essence in the subcontract between Hercules and Pres-Crete. Pres-Crete was made aware, by express provisions in the subcontract and by subsequent dealings with Hercules, that timely delivery in proper sequence of the precast components was an overriding feature of the agreement. Where time is of the essence, the party not performing on time can be subjected to an action for damages resulting from the delay. Kansas City Bridge Co. v. Kansas City Str. Steel Co., 317 S.W.2d 370, 379-381 (Mo. 1958). See Transport Mfg. & Equipment Co. v. Fruehauf Trailer Co., 295 F.2d 223, 234-235 (8 Cir. 1961); Williston on Contracts (3rd ed.) 846. As expressed by 3A Corbin on Contracts 713, (1951) in a discussion of 'When is Time of the Essence':
 
 
 20
 'Again the agreement may be in such terms that the first party promises performance by a stated time and the second party expressly makes its return promise conditional on the exact performance; in such a case, failure by the first to perform on time gives to the second a right to damages and also the legal privilege of not performing his own promise. And still further, although the second party's return promise may not be in terms conditional, it may be made so by construction of law because the first party's failure to perform on time will deprive the second of the substantial benefit for which he bargained.'
 
 
 21
 Because of the express contract provision that the time of delivery was of the essence, which, of course, is patently necessary in a construction project of this type in order for the work to proceed in an expeditious and economical manner, this contract clearly falls into the category of those contracts where time is of the essence and the time of performance is a condition.
 
 
 22
 The contention that Hercules' construction site preparations made it impossible for Pres-Crete to deliver the precast components within the time schedule of the subcontract was considered and determined adversely to Pres-Crete by the jury. Likewise the jury determined that the time for performance of the subcontract was not modified by mutual agreement of the parties. These factual issues were properly submitted to the jury and the jury's determination on these factual issues may not be disturbed on appeal.
 
 
 23
 General's principal claim of error is that Hercules' theory of measure of damages for delay is incorrect under the law. It contends that the proper theory of measure of damages for delay should, in this case, be arrived at by comparing the reasonable cost of building the entire structure at a particular time with the reasonable cost of building it at a later time.
 
 
 24
 The general rule for measure of damage in case of a breach of contract is the amount which will compensate the injured party for the loss which a fulfillment of the contract would have prevented or the breach of it has entailed. 25 C.J.S. Damages 74. See 5 Corbin on Contracts 1029 (1951). General's difference with Hercules centers on the means used to prove damages, framing the issue as to whether Hercules proved damages in a manner so unsupported by logical basis in fact and at such variance with accepted law, that the damages awarded cannot stand.
 
 
 25
 As outlined above, Hercules chose to segregate its claim for damages into five general areas. The first areas of claimed damage can be grouped into extra labor and equipment costs borne by Hercules because of Pres-Crete's defaulting on timely delivery of the precast. Using the period when Pres-Crete commenced delivery of precast, February 12, until May 6, Hercules computed the average man-hour cost (at base wage rates) and the average equipment cost per piece required for erection.
 
 
 26
 These figures were then contrasted with comparable figures for the period following May 6 when the precast components were delivered in substantially proper sequence with minimal fabrication deficiencies. The difference per piece in what it cost Hercules in base wages and equipment was then multiplied by the number of pieces erected in the February 12 to May 6 period to determine the amount that Hercules was damaged. Damages were so computed to have been $10,370 in extra erection labor costs, and $10,613 in extra erection equipment costs. To the latter figure was added $11,000 rental cost for an additional crane that Hercules had to employ from the middle of May until the middle of July in order to speed up erection progress due to Pres-Crete's defaults during the earlier period.
 
 
 27
 General questions Hercules' method of computation by contending that in the preliminary phase of any construction project, initial costs are likely to be higher than in later stages when crews become accustomed to procedures. At the trial, Hercules offered substantial evidence disputing that its crews were 'green', or that a lack of experience in handling precast materials raised erection costs during the initial stages of erection. The issue was one of fact for the jury's determination, and will not be disturbed by us.
 
 
 28
 Admitting General's argument that a means by which damages may be assessed is the reasonable cost of construction before breach of contract as compared with the reasonable cost after breach, it does not follw that we must find that the method adopted by Hercules and approved by the trial court was improper. Alternative methods of determining damages for breach of contract may be employed to meet the exigencies of any given situation. The test is 'reasonableness' of the methods used. See 5 Corbin on Contracts 1029 (1951). Comparing reasonable costs before and after breach of contract is designed to afford a basis on which to evaluate the damage caused by the defaulting party. Damages can also be proved by computing additional construction costs attributable to the defaulting party, and presenting this computation to the trier of fact who then must evaluate the validity of the evidence offered and reasonableness of the computation.
 
 
 29
 In the Kansas City Bridge Co., case, supra, where a contractor was claiming damages because of breaches and delays by its subcontractor, the Missouri Supreme Court held that comparing the actual cost of constructing a bridge with what the costs would have been had the subcontractor supplying steel for the bridge not been in default, was a proper method of computing damages. The method used by Hercules was comparable. Hercules showed actual costs of construction during the period when Pres-Crete's breach was manifest, compared to actual construction costs when Pres-Crete was fulfilling its contractual obligations. This method of computing damages is certainly not unreasonable as a matter of law. Likewise, Hercules' evidence cannot be deemed to have such an illogical basis in fact that submission of this evidence to the jury was error.
 
 
 30
 A third item of damages claimed by Hercules is premium or overtime payments made in an effort to speed up construction at the insistence of Hercules' bonding company. The premium time program was put into effect May 1, 1962. Hercules proved a total premium time expenditure for the entire project of $84,224. Then, Hercules subtracted from the total premium time cost (1) the amount that was paid before the speed up program was necessitated, and (2) the amount that Hercules would have had to pay in all probability even if the project had proceeded on schedule throughout construction. The first deduction was in the amount of $7,102 premium time paid out before May 1.
 
 
 31
 The second deduction was computed by Hercules in the following manner: Hercules selected the month of August as a typical month from which to measure premium time payments it normally would have had to incur. August was selected because about one-fourth of precast erection was accomplished in that month, the rate contemplated with Pres-Crete's fabrication and delivery schedule as called for in the subcontract. If the August progress rate had been maintained throughout the erection period, the parking structure would have been completed on time. Thus, the August premium time figure, $3,859 when multiplied by the number of months the erection would normally have taken, four months, demonstrated the total premium time, $15,436, that Hercules would probably have had to pay in any event to complete the parking structure on time. However, The May Company had promised, and later withdrew, an offer to absorb $5,000 of the premium time that Hercules was to have paid. Hence, the $15,436 deduction was reduced to $10,436 as the amount Hercules would have normally expected to absorb. Summarizing, from the $84,224 amount of premium that Hercules paid out, minus the two deductions of $7,103 and $10,436, Hercules computed its premium time damage at $66,685.
 
 
 32
 General contends that the above computation gave the jury a roving commission to guess and speculate with respect to premium time damages, that Hercules' computation includes premium time used on non-erection phases of the project, and that Hercules might have had to use extensive premium time even if the precast had been delivered on the dates specified in the subcontract.
 
 
 33
 General's objections are not well taken. Hercules presented evidence indicating that the sole cause for the necessary speed up in the entire construction project was Pres-Crete's default. Overtime wages occasioned by a breach of contract are a natural and foreseeable consequence resulting in damages. When the evidence strongly indicated that erection and subsequent completion of the parking structure were inter-related, it was not incumbent on Hercules to show that premium time costs were for erection overtime only. Hercules' compution of premium time damages is not as a matter of law unreasonable, and in fact, allows for premium time that Hercules expected to pay as part of the cost of the project.[3]
 
 
 34
 The fourth item of damages claimed by Hercules was the differential cost of constructing the downramp from the parking structure. Hercules' claim is based on the fact that a different method of constructing the downramp had to be utilized because of Pres-Crete's delays in delivering the precast.
 
 
 35
 Hercules' original plan called for bringing materials and equipment to pour the downramp over the floors of the erected precast parking structure. Hercules proved the estimated original cost of the downramp, $64,143 by use of a certified architect who was acting as their chief estimator at the time of the parking structure project. Because of Pres-Crete's default and subsequent delays, the downramp had to be poured in place without the benefit of the adjacent erected parking structure. Hercules showed an actual expense in constructing the downramp of $99,222. Construction was more costly because a crane had to be rented to hoist materials up to the level of the downramp being constructed. Labor costs were higher since hoisting by crane was less efficient than transporting by truck. Special forming devices, a concrete bucket and temporary electrical service increased Hercules' cost.
 
 
 36
 Hercules documented its actual expenses by showing the books and records kept on the project. The difference between what the downramp was to have cost to construct, and what it did cost to construct was shown to be $35,079.
 
 
 37
 General again challenges the reasonableness of the method that Hercules used in providing its claimed damages. Yet, General did not object to the testimony of Hercules' architect at the trial and had the right to explore the reasonableness of his estimate on cross-examination. On appeal, General cannot re-examine each element of the architect's estimate. The evidence offered by Hercules was certainly not so unreasonable and lacking in probative value to warrant saying that the trial court erred in allowing the jury to consider the evidence.
 
 
 38
 The final item of damages claimed by Hercules was the expense resulting from having to keep the entire job of constructing the parking structure open for an additional two month period. The parking structure was to have been completed on August 8, 1962, but because of delays caused by Pres-Crete, the project was not actually completed until October 8, 1962. In establishing this element of damages, Hercules' accountant, using accepted and approved accounting principles and methods, allocated that portion of Hercules' fixed overhead and expenses on this project to the additional two months working time. In essence, the method used was to take the annual regular business expenses of Hercules that were allocated to this particular job, divide that figure by fifth-two to get an average weekly total, then multiply that total by eight weeks (two months). The overhead burden for the eight week period was computed to be $9,192.
 
 
 39
 In addition, Hercules added $14,583 as job-site costs while keeping the job open, costs which must necessarily be incurred in supervising, maintaining and servicing construction. These job-site costs include provisions for temporary power, sanitary facilities, drinking water, foreman, timekeepers, etc. As above, Hercules' accountant arrived at a weekly figure for these items and multiplied it by eight weeks to arrive at a figure of $14,583. This figure, added to the overhead expense of $9,192, amounted to $23,775 as the amount Hercules claimed it was damaged by keeping the job open for the additional two month period.
 
 
 40
 General asserts that while these items may have been proper charges as expenses on Hercules' books for accounting purposes, they were merely bookkeeping transactions not constituting an actual loss to Hercules. General cites the Kansas City Bridge Company, case, supra, for the proposition that allocated overhead expenses cannot represent a compensable loss, unless, except for the delay, the one claiming the damage would have obtained other work sufficient in amount to absorb the allocated portion of the overhead.
 
 
 41
 Outlays for job-site costs incurred during the two month delay attributable to Pres-Crete's breach do represent a direct loss to Hercules and are properly recoverable. The holding in the Kansas City Bridge Company case, supra, seems somewhat exacting in adding an element of proof on the damaged party seeking recovery of allocated overhead costs. The usual rule in allowing allocated overhead expenses for delays resulting from a breach of contract is found in Brand Inv. Co. v. United States, 58 F.Supp. 749, 751 (Ct.Cl.1944). 'We are allowing the plaintiff a proportionate part of its main office overhead. While such an element of damage can never be proved with mathematical precision, it is standard accounting practice to attribute main office expense to various company operations on some fair basis.'
 
 
 42
 Yet, even under the more exacting standard prescribed by Kansas City Bridge Company, supra, Hercules was deemed by the District Court to have presented evidence sufficient to justify the submission of the issue that the allocated overhead expense represented not only an expense, but a loss and that other jobs would have been obtained to absorb such overhead. In viewing the evidence presented by Hercules' president that Hercules did not bid jobs that it was specifically invited to bid because of Hercules' two month delay in completing the parking structure, the court did not err in submitting this issue to the jury.
 
 
 43
 In summary, the damages awarded Hercules were proper. The American Law Institute's Restatement of the Law of Contracts, Vol. 1, 331, reads: 'Damages are recoverable for losses caused and other gains prevented by the breach only to the extent that the evidence affords a sufficient basis for estimating their amount in money with reasonable certainty.' General cannot here relitigate the issues on which the jury determined a breach of contract and damages; ample evidence supported these findings. The means by which Hercules chose to prove its damages were not as a matter of law improper. 'It is sufficient if a reasonable basis of computation is afforded, although the result be only approximate.' Eastman Kodak Co. v. Southern Materials Photo Co., 273 U.S. 359, 379, 47 S.Ct. 400, 405, 71 L.Ed. 684 (1927); Story Parchment Co. v. Paterson Paper Co., 282 U.S. 555, 563, 51 S.Ct. 248, (1931); Red Jacket Oil & Gas Co. v. United Fuel Gas Co., 146 F.2d 645, 650 (4 Cir. 1944).
 
 
 44
 General also asserts as error the trial court's refusal to permit questioning of Hercules' estimator about whether Hercules had taken any bids from others for erection of the precast. General's stated purpose in attempting to elicit this testimony was to show that part of Hercules' damages was the result of Hercules' low bidding of the project, and to impeach the credibility of Hercules' estimator who bid the job.
 
 
 45
 The trial court correctly refused to permit this line of questioning. Hercules' theory of damages for proving erection cost damages, as discussed above, was predicated on showing the difference between actual cost when Pres-Crete's deliveries proceeded as planned and when Pres-Crete was in default. The evidence sought to be introduced may very well have been irrelevant. Only with respect to the downramp construction, which was to be poured in place and not erected with precast, did Hercules compare the estimated cost of construction with actual costs.
 
 
 46
 But even assuming, without deciding, the relevancy of General's offer, the attempted method of eliciting this evidence was clearly improper. As the trial court noted, General could have on cross-examination questioned Hercules' estimator on his experience and method of bidding to impeach his testimony. Or, if such proof were relevant, General could have called witnesses to show that the bid by Hercules was faulty. The jury could have then decided whether Hercules' low bidding contributed to the damages it sustained. General chose instead to try and prove through Hercules' estimator what others bid on the erection phase of the project. This evidence would be hearsay.
 
 
 47
 In ruling on the admissibility or exclusion of evidence, even though Rule 43, Fed.Rules Civ.P., provides that the statute or rule (federal or state) which favors the reception of proffered evidence shall govern its admissibility, the trial court has an area of discretion. Absent a clear case of inclusion or exclusion, his ruling will stand as he is in a position to judge the exigencies of a particular case, and he has the duty to keep the trial within proper bounds. Therefore, his discretion when exercised within normal limits should not be disturbed. Norwood v. Great American Indemnity Co., 146 F.2d 797, 799 (3 Cir. 1944); Brigham Young University v. Lillywhite, 118 F.2d 836, 841 (10 Cir. 1941); see 5A C.J.S. Appeal & Error 1604. The trial court's ruling on the evidence in this case appears proper and there certainly has been no showing of an abuse of discretion.
 
 
 48
 General objects to a number of the instructions given or refused by the trial court, but principally contends (1) that it was prejudiced by the instruction providing that time was of the essence of the contract, (2) the measure of damages instruction, (3) an asserted failure to adequately present General's theory that the contract was modified by agreement or implied waiver, and (4) that Hercules' damages resulted from Hercules not being in a position to perform. Most of General's objections to the instructions are based on a re-argument of its theory of the applicable law on contracts and the measure of damages, which arguments have previously been considered and disposed of in this opinion. We see no purpose in restating these arguments, which we consider not well taken, to either the instructions as given or refused. It is, of course, axiomatic that the instructions must be considered as a whole. Weir v. Simmons, 357 F.2d 70, 74 (8 Cir. 1966); Jiffy Markets, Inc. v. Vogel, 340 F.2d 495, 500 (8 Cir. 1965).
 
 
 49
 Instructions are also subject to the 'harmless error' rule, 61 Fed.R.Civ.P., which directs the courts to 'disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.' Jiffy Markets, Inc. v. Vogel, supra; 7 Moore's Federal Practice (2 ed.) 61.09. It is therefore incumbent upon General to show prejudicial error in the instructions before this court can consider reversing a verdict for an error or deficiency in instructions. The principal instructions are set forth below.[4]
 
 
 50
 As illustrative of General's objections, it contends that Instruction I is prejudicial in that it does not adequately provide for the jury finding that the contract was modified by the parties as to when Pres-Crete was to deliver the precast components. General is quibbling when it argues that the first portion of Instruction I (set forth in footnote 4) 'within the time period provided for in the contract or as modified by the parties' is in such proximity to paragraph 2 of the Instruction I, that a jury could not possibly be expected to find that fabrication and delivery to the jobsite by Pres-Crete and 'within certain periods of time' was 'as modified by the parties.' General contends the instructions should have set out specific dates relied on by the parties. Clearly, modification of Pres-Crete's time for delivery under the contract was a jury question. Instruction I fairly states the issue for the jury.
 
 
 51
 We have carefully considered the entire set of instructions given by the experienced trial judge along with the refused instructions. When read as a whole, the instructions fairly present General's theory of the case on the applicable law and within the factual context of the evidence. There was no prejudice or error in the giving or refusing of instructions.
 
 CROSS-APPEAL
 
 52
 Hercules filed a cross-appeal alleging error in the trial court's denying Hercules' Motion to Amend the judgment by adding pre-judgment interest. The decision of the District Court is affirmed. There is no Missouri statute authorizing interest in this type of case. Generally, absent statute or contract authority pre-judgment interest is not allowed on an unliquidated sum. St. Louis Housing Authority v. Magafas, 324 S.W.2d 697, 700 (Mo. 1959); Cannon v. Bingman, 383 S.W.2d 169, 173 (Mo.App.1964). We recognize that equitable principles of fairness and justice may be taken into account to allow pre-judgment interest in certain types of cases, but this case does not fall in that category. See 22 Am.Jur.2d 179, 181.
 
 
 53
 The District Court did not err in refusing to allow interest here.
 
 
 54
 Judgment affirmed.
 
 
 
 [1]
 The major components are the columns, spandrels and beams. The joists are considered minor components
 
 
 [2]
 Back charges were made, however, by Hercules against Pres-Crete. The back charges were made only for labor and equipment costs necessary to correct imperfections in the precast components themselves, as distinguished from defective precasts that caused the entire erection process to be delayed and proceedless efficiently. General claims these back charges are included in Hercules's complaint and there is evidence in the record to support this claim, though the Court's charge to the jury told it 'You are not to consider backcharges as evidence or of a lack of evidence on damages.' (R. 229) and further that another lawsuit pending between the parties, apparently on back charges, was not to be considered by the jury
 The parties themselves are not in agreement on this issue and we express no opinion thereon, thus leaving this matter for resolution in the other suit that is pending between the parties. If the back charges, or any of them, were included in Hercules's demand as it was presented to the jury, double recovery should not be permitted. This issue can be determined in the other lawsuit between the parties.
 
 
 [3]
 It does not appear clearly on the record that General should be required to pay the $5,000 loss of premium time that The May Company first agreed to pay and then later decided not to pay. This appears possibly in the category of a windfall to Hercules, and if Hercules would have had to expend some $15,000 normally on premium time during the period in question, then the expense is chargeable only to Hercules. The evidence on this issue is amviguous. The trial court is, however, in a better position to evaluate the evidence, and if the trial court in its discretion decides a submissible issue is made on a point the matter is then left for jury determination. Hercules claimed damages of $157,522, and submitted evidence tending to prove damages in that sum. The jury as trier of the facts, however, rendered a verdict of only $117,500. The jury obviously found some of the issues on damages claimed in favor of General, and so long as the court did not err in admitting evidence on damages, the matter was properly determined by the jury. General has therefore not shown any clear error that would require a reversal on this point
 
 
 [4]
 Instruction I reads in part:
 'Under this contract Missouri Pres-Crete obligated itself to perform two essential duties within the time period provided for in the contract or as modified by the parties:
 (1) To complete an engineering redesign of the parking structure of the Famous-Barr garage so that same could be erected using a system of precast concrete, and
 (2) To fabricate and deliver to the job site, within certain periods of time, all of the necessary precast concrete pieces in such condition that they could be erected into the structure by Hercules Construction Company through use of those ordinary and customary methods and procedures as a reasonably skillful and experienced erector would use, and that such erection could be accomplished according to the terms of Hercules' general contract with May Department Stores.
 'A failure by Missouri Pres-Crete to substantially perform either of these duties within the specified time, providing such failure was not caused by the acts or omissions of plaintiff, constitutes a breach of the contract dated November 29, 1961.
 You must, therefore, first determine from all the evidence in the case whether or not Missouri Pres-Crete did in fact breach its contract dated November 29, 1961.'
 Instruction IV reads as follows:
 'Under the contract in this case, time was of the essence. In this connection, you are instructed that if you find that Missouri Pres-Crete met with difficulties which were not anticipated by it when the contract was signed, yet if you further find that such difficulties did not result from any cause for which plaintiff was responsible, and that Missouri Pres-Crete failed to substantially perform the contract within the time agreed upon by the parties, then any such difficulties encountered by Missouri Pres-Crete do not constitute any excuse for the delay.'
 Instruction V reads as follows:
 'If you find from the evidence that plaintiff incurred additional costs in performing its contract with the May Company by reason of lack of experience, poor judgment, or failure to employ accepted erection procedures, then you are instructed that plaintiff may not recover any such additional costs so caused.
 'If under the evidence, you find that all of the additional costs for which plaintiff seeks recovery herein directly resulted from its own acts or omissions and that plaintiff would have incurred all such additional costs whether or not there were any delays on the part of Missouri Pres-Crete, then plaintiff is not entitled to recover in this action and in such case your verdict must be for defendant.'