NATKIN & COMPANY, Plaintiff,

v.

GEORGE A. FULLER COMPANY

and

Western Electric Company, Incorporated,
Defendants.

No. 17216–1.

United States District Court,
W. D. Missouri, W. D.

Aug. 22, 1972.

David Skeer and Herbert M. Krigel, Kansas City, Mo., for plaintiff; Sheffrey, Ryder, Skeer, Krigel & Rose, Kansas City, Mo., of counsel.

Shook, Hardy, Ottman, Mitchell & Bacon, Kansas City, Mo., for Fuller.

Stinson, Mag, Thomson, McEvers & Fizzell, Kansas City, Mo., for Western Electric Co., Inc.

## MEMORANDUM AND ORDER

JOHN W. OLIVER, District Judge.

### I

This is a jury-waived building construction contract case. Pursuant to the stipulation under which this case was submitted we have considered over 5,400 pages of deposition testimony of fifteen witnesses, and approximately 1,000 pages of testimony of four witnesses given in open court. The hundreds upon hundreds of exhibits adduced in evidence are more easily weighed than counted. The parties, in an exemplary manner, have submitted their respective suggested findings of fact and suggested conclusions of law, supported by references to the record, together with appropriate responses to opposing counsel's suggestions.

Those suggestions and responses, all keyed to specific numbered exhibits and to specific page references in the voluminous record, reveal that this obviously complex and expensive litigation has been and continues to be waged on a winner-take-all and loser-lose-all basis. We are grateful to counsel for their careful preparation and clarity of their post-trial suggestions, supporting data, and briefs, all of which total more than 900 pages of highly concentrated effort.

### II

Counsel for all parties followed both the letter and the spirit of our admonition to avoid the use of "color words" (R. 1119), in making their suggested findings of fact and suggested conclu-

sions of law. Unless we make appropriate use of the suggested findings which we believe are proper and supported by the evidence, we run the danger not only of deciding this case on factual and legal theories other than those advocated and relied upon by the parties; we would create a situation which could only add to the already formidable burden that both counsel and the Court of Appeals will face on appeal. Cf. United States v. F. D. Rich Co., Inc. (8th Cir., 1971), 439 F.2d 895 at 899.

Accordingly, we make and accept plaintiff's findings I through XII, inclusive, finding XIII as we shall modify the amount of damages, and finding XV as suggested. We reject plaintiff's finding XIV, which is really a heading for supporting data, and plaintiff's finding XVI, in regard to lost and destroyed records, because we do not deem that either finding necessary for decision.

We also state that plaintiff's supporting statements and references to the record, as contained on pages 1 to 295 in the first two volumes of plaintiff's initial post-trial filings do in fact support the findings of facts made as we have indicated, excepting, of course, those data stated in support of particular dollar amounts for particular items in Exhibit 9521 and Exhibit 9916 which we shall later indicate are not, in our judgment, supported by sufficient evidence. The data cited in the record in support of the dollars for items on those exhibits which we find plaintiff is entitled to recover are, in our judgment, sufficient to support both plaintiff's basic theory of damages and the total amount of damages which we determine plaintiff is entitled to recover.

We have carefully studied the respective filings of the parties and the specific portions of the record to which our attention was directed in regard to every relevant circumstance which either side refused to admit. Indeed, we have studied practically all of the deposition testimony in order to make certain that the testimony of a particular witness not be viewed out of context.

We are convinced that the plaintiff has established defendants' liability and its damages in accordance with familiar and applicable standards of burden of proof. We are also satisfied that the defendants did not establish, to use the language of defendants' joint suggested finding D XIII, that "The cause of Natkin's loss was its own acts, conduct, omissions and risks which were its own responsibility."

We believe that the rationale of our determination of this case will be made more clear if we expressly indicate our rejection of defendants' joint suggested factual findings D IV through D XI, inclusive, as they relate to "Claimed Breaches of Contract" as being unsupported by a preponderance of the credible evidence in this case. We so find.

We also make an express finding that a preponderance of the credible evidence does not support defendants' jointly suggested finding D XII, as it relates "Natkin's risks" or D XIII, relating to "Settlement and Estoppel." There can be no doubt that labor was inefficiently used on the job, that proper control of that labor became exceedingly difficult under the circumstances, and that many contractors, including Natkin, were delayed by East Texas Fire Protection Company. But it cannot fairly be found on the basis of all the facts and circumstances in this record, to use the language of D XII, D, that "Natkin was delayed and caused to expend more money to perform its work . . . by reason of its own errors and acts and acts of its material and equipment supplies."

We expressly reject such a finding because it would necessarily be based on the factually unsupportable premise that it was Natkin's actions, rather than those of the defendants, which actually caused the job to get out of everyone's control. We cannot accept D XIII because there is no credible evidence that the parties intended to settle all their controversies by change-order negotiation. Defendants' joint suggested finding D XIV that "Plaintiff's damage

theories are unreasonable, illogical, speculative, and unsupported by the evidence," is, of course, expressly rejected.

## III

We have the feeling that parties, particularly the losing parties, would like to have a full and detailed explanation of why each of their respective factual arguments were either accepted or rejected. We do not believe that the filing of such an obviously lengthy and detailed opinion would serve any useful purpose. Both plaintiff's narrative post-trial brief and defendants' joint post-trial narrative argument show that the parties' arguments, for the most part, were devoted to factual, rather than legal, argument. Indeed, the first sentence of defendants' post-trial brief incorporated by reference WECo's opening statement at the trial. That opening statement, which was carefully prepared and filed in written form, stated that "It is the position of the defendant Western Electric that neither it nor its co-defendant Fuller breached the contract with Natkin; that none of their acts caused plaintiff damage, but rather that its loss on the Shreveport project was caused by its own lack of supervision of inefficient labor forces (which inefficiency was not adequately provided for in Natkin's bid) and its failure to adequately conduct and coordinate its work." WECo's opening statement accurately forecast the areas of ultimate factual dispute which were to be developed at trial by devoting particular sections of its opening statement to "The CPM", "The Work Orders and Drawing Changes," "Owner-Furnished Equipment and Shop Drawings," "Harassment, Scheduling, and Accelerations," "Plaintiff's Labor and Material and Inventory Control Problems," and the like.

There can be no doubt that the trial positions of the parties were and are poles apart in regard to each of the areas of factual dispute which developed as forecast. Their evidence, for example, in regard to the abandonment of the Critical Path Method (CPM) and what,

if any, impact that undisputed fact had upon the job was in almost total conflict.

The sharpness of that particular factual dispute was ultimately presented for decision by the parties' respective suggested findings of fact. Plaintiff's suggested CPM findings (II, II A, through II T, inclusive, and III, III A through III E, inclusive) presented plaintiff's view, supported by its references to the record. Defendants' joint suggested CPM finding D VIII, frankly conceded that the defendants did in fact fail to utilize a computer for the duration of the job, but, in order to avoid a possible factual basis for liability, requested a finding that "this did not adversely affect the plaintiff and the job was not accelerated." Defendants directed attention to the portions of the record which they believed supported their suggested finding.

The choice of whether plaintiff's suggested CPM findings or whether defendants' joint suggested CPM finding should be accepted was not a difficult choice when made in light of the specific evidence adduced in regard to the CPM, viewed in light of the other facts and circumstances in evidence. All parties agreed that the contract documents provided that a Critical Path Method of scheduling would be followed throughout the job. Defendants expressly conceded in their narrative argument that "The CPM was not continually up-dated throughout the job" (D. Vol. III, p. 27). Defendants also implicitly conceded in their data filed in support of their requested finding that "WECo met with Fuller and brought to its attention the fact that WECo would like to have them take a look at their schedules to determine whether or not they could shorten them with respect to the general office building and certain other areas." (D. VIII, 26 g (1)) and that later, when WECo was advised that it could not move into the office building in late September, "WECo then demanded that a schedule be made that it could live with, namely, the first week in October for the completion of four of-

fices and a reception area" (D. VIII 28).

In light of such concessions by the defendants and from other facts and circumstances established by the weight of the evidence, we became convinced that the defendants, at the instance of WECo, abandoned the Critical Path Method required by the contract documents for their own purposes. While some bar charts were prepared for particular portions of the job, those bar charts did not afford, nor were they designed to afford, an over-all coordinated schedule of the total work covered by the contract. We became convinced that WECo, in the position of the owner, in effect elected to assume control of the contract and the job in order to meet the commitments it had made to its own Occupancy Division. It became, in our judgment, quite apparent from all the facts and circumstances that WECo had power and had exercised that power to enforce its will on all parties concerned.

The dispute concerning both the admissibility and relevancy of a November 22, 1967 print-out (which projected a completion date of August 7, 1968, as contrasted with the projected completion date of September 11, 1967, projected in the December 2, 1966 print-out) is generally related to the CPM dispute. We do not believe that the isolated factual circumstance which relates to the completion date projected by the November 22, 1967 print-out is controlling. Indeed, the general situation shown by all the evidence would not have been substantially altered if no evidence whatever had been adduced in regard to the November 22, 1966 print-out. For we are convinced that the completion date projected in the December 2, 1966 print-out was itself inaccurate in that the weight of the evidence established that it included as a part of its input only work-order changes which had been approved prior to that date.

The fact that the abandonment of the Critical Path Method resulted in an abandonment of any accurately projected completion date does not depend upon the November 22, 1966 print-out. Nor are the circumstances which relate to the November print-out relevant to the fact that separate completion dates for particular portions of work were in fact established by methods clearly outside the provisions of the contract, regardless of the impact those dates might have on the overall job. And it is quite apparent that the multiple changes in the scope of the work could not be accomplished in the time originally contemplated by the contract documents for the completion of the work defined by the original and unchanged plans and specifications.

It is therefore apparent that the isolated controversy concerning the different projected completion dates in the two print-outs is minimal. The significant ultimate facts in regard to the CPM and its abandonment and the inaccurate projected completion date are that the defendants were not interested in establishing an accurate completion date in accordance with the method provided by contract; that no accurate or reasonable completion date for overall completion of the job was in fact established in accordance with contract procedures or otherwise; that various completion dates for particular portions of the work were dictated and established without Natkin's consent, regardless of what impact such dates might have on the execution of the totality of the work covered by Natkin's subcontract; and that the defendants elected to take their chances as to whether their action might violate Natkin's contractual rights. For the reasons we have outlined, we were convinced that the facts and circumstances stated in the subparagraphs of plaintiff's suggested CPM findings II and III were true, that it was proper to note our acceptance of those findings, and that, as found, those facts should be considered in their totality in our determination of this case.

It is quite apparent that plaintiff's data in support of its suggested CPM findings stated and relied upon all of the circumstances we have outlined in our

discussion of the parties' suggested CPM findings. Indeed, plaintiff relied upon a great many more details that it believed were significant which we have not mentioned. Discussion of each detail stated in support of and in opposition to every suggested finding as those details are set forth in the hundreds of pages of the parties' post-trial briefs would not alter the nature of the questions which may be presented on appeal. The basic question on appeal so far as factual findings are concerned will obviously be whether the findings of fact made by this Court are clearly erroneous.

We have, for the most part, in judging the weight of the conflicting evidence, resolved the numerous factual disputes in favor of the plaintiff. We have concluded and stated that the portions of the record cited to support plaintiff's suggested findings, in our judgment, do in fact require and support the findings we have made. If detailed discussion of every contested factual detail in the same manner as we have discussed the CPM and related suggested findings would simplify the disposition of this case on appeal we would not hesitate to convert our working papers into a formal opinion. But we cannot, however, convince ourselves that the task of either counsel or the Court of Appeals would be simplified by so doing. Indeed, we are inclined to believe that our indicated acceptance of plaintiff's suggested findings and the statement of our view in regard to the data supporting those findings will best afford both sides the fairest opportunity to present this case to the Court of Appeals on substantially the same factual and legal theories as the case was presented to this Court.

It is for the reasons stated that we will not further discuss each conflict in the conflicting suggested findings except in regard to our findings in regard to damages.

## IV

Plaintiff's findings XII and XIII relate to plaintiff's damages. We make and accept both findings as suggested except for the dollar amounts contained in finding XIII D. The data cited in support is sufficient to sustain those findings except for the dollar amounts. Our rejection of a substantial portion of plaintiff's claim for damages was made in light of our view of the applicable law. Our specific findings in regard to the amount of plaintiff's damage will be made following our discussion of the applicable law.

The parties are not in substantial disagreement in regard to the legal principles applicable to plaintiff's right to damages. They, of course, disagree whether a particular case should or should not be distinguished on its facts. Both sides are also in apparent agreement in general that no conflict of laws or *Erie* questions are presented. Indeed, except in one instance which we will discuss later, they cite and rely primarily on Missouri and Eighth Circuit cases. We agree with counsel that those cases reflect the applicable general principles of applicable law.

The Missouri cases cited, Kansas City Bridge Co. v. Kansas City Str. Steel Co. (Sup.Ct. of Mo., Div. 1, 1958), 317 S. W.2d 370, 381, and Coach House of Ward Parkway v. Ward Parkway Shops (Sup.Ct. of Mo., Div. 1, 1971), 471 S.W. 2d 464, 471, both reflect acceptance of principles stated in § 330, § 331, and comment a. to the latter section of the Restatement of the Law of Contracts. The Eighth Circuit cases cited, General Insurance Company of America v. Hercules Construction Co. (8th Cir., 1967), 385 F.2d 13, 23, and Clements Auto Company v. Service Bureau Corporation (8th Cir., 1971), 444 F.2d 169, 190, also approve the principles stated in the Restatement. In addition, those cases adopt and quote the rules of decision generally developed in antitrust litigation where the ascertainment of the amount of damages is also recognized to be difficult. Indeed, *Clements Auto Company* was handed down immediately before the trial of this case (R. 36). Before trial, the Court directed counsels' specific attention to that portion

of that case which concluded that "The Supreme Court and this Court have stated on a number of occasions that, once the fact of damages has been established, the courts are allowed considerable leeway in arriving at the amount of damages" (R. 37).

Plaintiff's suggested findings XII and XIII are based upon the premise that the fact of damage and the amount of its damages are properly determined and calculated in accordance with the principles articulated in the authorities to which we have made reference. Defendants, on the other hand, contend that "Natkin's theory of damages, in reality, is the total cost theory" (Vol. III, p. 42). Defendants argue that "Natkin is merely subtracting its estimated costs from its actual costs and this is nothing more than the total cost theory" (Vol. III, p. 43). Defendants would dispose of all questions concerning damages by seeking to have this Court accept its suggested finding D XIV which states that: "Plaintiff's damage theories are unreasonable, illogical, speculative, and unsupported by the evidence."

We do not agree with the defendants' broad and basic attack on plaintiff's theory of damages. We find and conclude that plaintiff's general damage approach is consistent with applicable law and that plaintiff's findings XII and XIII, except for the amount of damages, are in fact supported by plaintiff's data in support of all the subheads of its suggested findings XII, XIII, and XIV, and by its discussion of that data as found therein and as found in plaintiff's post-trial brief in volume III of plaintiff's initial post-trial filing.

We do not believe, however, that plaintiff is entitled to recover for all the items claimed on plaintiff's Exhibits 9521 and 9916. Neither the "leeway" allowed in arriving at the amount of damages, to use the Eighth Circuit's language in *Clements Auto Company*, nor the Eighth Circuit's recognition in *Hercules Construction Company* that "Alternative methods of determining

damages for breach of contract may be employed to meet the exigencies of any given situation" (385 F.2d at 20) changes the basic applicable test of "reasonableness," as stated in the latter case. That case also teaches that the trier of the facts "must evaluate the evidence offered and the reasonableness of the computation."

We make and accept all portions of plaintiff's suggested findings XII and XIII except we find that the amounts plaintiff is entitled to recover in finding XIII D is $715,567.78 (rather than $1,042,136.42, as suggested), plus the retention of $24,087.00, for a total of $739,654.78 (rather than $1,066,233.42, as suggested).

In explanation of our finding XIII D, we state that we believe that plaintiff's computation of damage, as stated in column 1 and 2 on Exhibit 9916 is supported by the evidence and meets the test of reasonableness in regard to the items of:

| | |
|---|---|
| Added Labor Cost | $573,641.08 |
| Equipment | 41,807.00 |
| Job Site Expense | 100,119.70 |
| | $715,567.78 |

In regard to the item of Job Site Expense, Exhibits 9521 and 9916 both carry that figure at $104,239.70. It was noted both at trial and in plaintiff's supporting data (Vol. II, p. 266) that line 1 of supporting Exhibit 9520 contained a $4,120.00 mathematical error; hence, our finding of $100,119.70, rather than $104,239.70, as stated on both Exhibits 9521 and 9916.

We find that plaintiff's claims in regard to Sheet Metal in the amount of $89,904.00 and Hand Tools in the original amount of $26,129.57, per Exhibit 9521 (later reduced to $21,841.79 in Exhibit 9916) are not sufficiently supported in that those items are dependent in whole or in major part upon plaintiff's Documented Claim. We find and conclude that the data which plaintiff assembled to support its Documented Claim is not comparable to the evidence

adduced at trial to support plaintiff's claims for Added Labor Costs, Equipment, and Job Site expense. We believe the latter evidence fully meets the standards stated in the cases and the test of reasonableness under the circumstances. We do not, however, believe the same thing is true in regard to those items in Exhibits 9521 and 9916 which rest in whole or in part on plaintiff's Documented Claim Data. It is for that reason that we reject plaintiff's claims for Sheet Metal and Hand Tools as being without appropriate support in the record.

The question of whether the items of Interest, Mark Ups, and the 15% Fee on Exhibits 9521 and 9916 in the total amount of $201,203.74 and $180,542.60, respectively, should be allowed is not without difficulty. We recognize that the Court of Appeals in *Hercules Construction Co.* expressed the view that the rule as stated by the Supreme Court of Missouri in *Kansas City Bridge Company* in regard to allocated overhead costs "seems somewhat exacting" (385 F.2d at 23). But we do not believe that case supports the items under discussion.

In approving alternative methods of determining damages and in enunciating the "reasonableness" test, *Hercules Construction Company* cited § 1029 of *Corbin on Contracts* with approval. On page 181 of § 1029, Professor Corbin noted with approval that "Courts have in the past invented alternative methods of measuring damages." But that authority added a caveat that "a court should not adopt a new method, however, unless it is consistent with the generally approved purpose of giving a remedy in damages."

We recognize, of course, that *Hercules Construction Company* quoted with approval the conclusion of Eastman Kodak Company v. Southern Materials Photo Co., 273 U.S. 359, 379, 47 S.Ct. 400, 405, 68 L.Ed. 868 (1927), that "It is sufficient if a reasonable basis of computation is afforded, although the result be only approximate." But *Her-cules Construction Co.* also contains an implicit caveat to that broad principle by its quotation of that portion of § 331 of the Restatement of Contracts which states that "damages are recoverable for loss caused and other gains prevented by the breach *only to the extent that the evidence affords a sufficient basis for estimating their amount with reasonable certainty.*" [Emphasis ours]

As we read *Hercules Construction Co.* and other cases in the construction contract field, the language quoted from *Eastman Kodak* and from § 331 are completely consistent statements of the slightly different facets of the applicable law. We believe both quotations reflect the general agreement stated in many cases that the particular factual circumstances presented in construction contract cases generally are so varied that, in the final analysis, each case must be determined on the particular factual circumstances presented.

We can not believe that § 331 of the Restatement suggests that every plaintiff in every construction contract case must be awarded damages both for "losses caused" and for "other gains prevented," within the meaning of that section. Indeed, the language of § 331 quoted by *Hercules Construction Co.* which states that damages may be recoverable *"only to the extent* that the evidence affords a sufficient basis for estimating their amount in money *with reasonable certainty,"* is, in our judgment, but another way of stating the test of "reasonableness" announced in that case.

We can not find that the record in this case contains a sufficient factual basis to support plaintiff's claim for Sheet Metal in the amount of $89,904.00, for Hand Tools in the reduced amount of $21,841.79, for Interest in the amount of $38,651.25, for the 3½% and 2½% G & A district and home office Mark-Ups in the total reduced amount of $43,-504.25, or the claimed 15% fee in the amount of $137,038.36, as those figures appear on Exhibit 9916 (which reflect-

ed plaintiff's final position in regard to the claims originally stated in Exhibit 9521).

We therefore find and conclude that the objections stated by the defendants as they appear in Volume I of their initial post-trial filing on pages 174–5 (Sheet Metal); pages 177–8 (Hand Tools and Interest); pages 178–9 (Mark-Ups and Fee) are well taken.

## V.

Plaintiff's suggested conclusions of law I, III, IV, V, VI, VII, VIII, IX, X, XIII and XVII are made and accepted as submitted. Plaintiff's suggested conclusion II is accepted with a modification which we shall later indicate. Plaintiff's suggested conclusions XI, XII, XIV, XV, and XVI are refused for reasons later stated.

■ In order that the rationale of our conclusions of law be clear for purposes of appellate review, we shall state the reasons why we accept, modify, and reject each of plaintiff's suggested conclusions.

*Conclusion I:* Defendants agree that this conclusion should be made.

*Conclusion II:* The introductory clause of plaintiff's suggested Conclusion II stated that "Time was of the essence in the instant contract *and therefore* . . . . We eliminated those words and the words "on time" from plaintiff's suggested conclusion so that our conclusion II reads: "The failure of the defendants, or either of them, to perform their contractual obligations renders them liable for the additional costs sustained by plaintiff because of their said failures."

While we do not agree with defendants' argument that the absence of the words "Time is of the essence" in the contract documents creates some sort of a presumption, we do not believe that the defendants' failure to perform their contractual obligations in regard to delays may be said to rest on the narrow question of whether it may or may not be said as a matter of law that time was

or was not the essence of the contract. As a matter of fact, rather than as a matter of law, we have no doubt that time was the essence of the contract.

Numerous provisions in the contract relate to the time within which the total work covered by the contract was to be performed. Articles VI, VII, and VIII of the Special Provisions, for example, provided that permit work could be done out of sequence, subject to a claim for increased costs and subject to the usual requirements of extension of time, and made specific provision as to delay of work. Those provisions, when considered together with required CPM scheduling, the establishment of the milestone dates and other explicit requirements of the contract documents, all establish that the parties gave very specific attention to time sequence and the schedule under which the total work covered by the contract was to be performed.

■ Our deletion of plaintiff's suggestion in regard to time merely reflects our view that defendants' liability rests upon grounds much broader than that implied by inclusion and use of the words "Time is of the essence" in this important conclusion of law.

*Conclusion III:* Defendants recognize that there is an "implied contractual obligation not to hinder" (D. Vol. III, p. 2). Defendants, however, contend that this obligation consists "only of an obligation not to willfully or negligently fail to cause the work to be completed, or the materials to be furnished, in time to be utilized in the ordinary and economical course of the performance of the instant contract." (D. Vol. III, p. 2). Examination of defendants' response to plaintiff's suggested conclusion (D. Vol. III, pp. 2–4) establishes that defendants' argument is an argument based on defendants' view of the facts. On page 3 (D. Vol. III), for example, defendants contend that "the facts show that Natkin's losses were caused not by hindrance or delay from WECo or Fuller, but from Natkin's own risks—inefficient labor, inadequate supervision, poor warehous-

ing, and other acts and shortcomings of its own." Our acceptance of plaintiff's suggested findings of fact and our rejection of defendants' suggested findings of fact in connection with those matters remove the base for defendants' objection to plaintiff's conclusion III.

*Conclusion IV:* We recognize that the last clause of plaintiff's conclusion IV states that the plaintiff was prevented from "completing its performance within the time contemplated and agreed." That conclusion does not, in our judgment, contain the same sort of implicit limitation which we noted in connection with conclusion II. The essential part of conclusion IV is included in the suggested language which states that "Plaintiff is entitled to recover its additional costs imposed by failure of defendants which delayed plaintiff's performance." Because we do not believe any limitation is implied by the additional language, we make and accept plaintiff's language as suggested.

Defendants' objection to plaintiff's suggested conclusion IV does not basically quarrel with the principle of law stated. Instead, defendants argue that the cases upon which plaintiff relies "are distinguishable from the case at bar because in this case the essential element of causation has not been established." (D. Vol. III, p. 6). Defendants also argue that findings similar to those implicitly made by the jury in *Hercules Construction Co.* "can not be made on the Natkin record after examining the facts regarding labor, supervision, warehousing, and its own acts and defaults" (D. Vol. III, p. 5).

■■■■ Our rejection of defendants' joint suggested finding of fact D, XIX, and other similar suggested findings establishes that the underlying factual circumstances upon which defendant bases its argument against plaintiff's conclusion IV must be determined against defendants' contentions.

*Conclusion V:* Defendants admit that Fuller did in fact withhold payment but they contend that this was done "by Fuller alone . . . to expedite the

work of Natkin's subcontract." (D. Vol. III, p. 6). Our findings and conclusions in regard to WECo's domination of Fuller and our other findings in regard to WECo's take-over of the contract make defendants' objections to conclusion V untenable.

*Conclusion VI:* Defendants argue that the "three short answers" to plaintiff's suggested conclusion VI are: "(1) The defendants did not order acceleration, or do anything approaching such an order; (2) Natkin's alleged loss flowed from its own inefficient labor and other causes for which it was responsible, and not for harassment; and (3) Natkin gave no notice of accelerating at defendants' expense, thereby depriving WECo of the opportunity to give attention to such cost." The first two "answers" are both contrary to the facts as we have found them. The third "answer" argues generally that Natkin failed to follow contract procedures. That argument is untenable for reasons we shall state in connection with defendants' objections to plaintiff's conclusion XVII.

*Conclusion VII; VIII, and IX:* Defendants agree that conclusion VII is a proper statement of the law. Defendants combine their objections to conclusions VIII and IX under a single heading in their response to plaintiff's suggestions. See D. Vol. III, pp. 8–11. Apart from a reiteration of what we have determined to be an untenable view of the facts in regard to causation, defendants' basic argument rests upon their factual contention that Natkin's proof of damage was based solely and entirely upon what defendants call the "total cost method." Defendants argue that the principles stated in *Hercules Construction Co.* and the other cases we have cited do not support plaintiff's damage theory. They argue that "Natkin's damage theory is unreliable because there is no valid before-and-after basis of comparison" (D. III, p. 11). Defendants further contend that "by expert testimony [defendants] demonstrated the basic infirmities of this cornerstone of plaintiff's theory" (D. Vol. III, p. 11). Interlaced with

those arguments is defendants' factual contention that "front-end loading . . . was used in billing this job" (D. Vol. III, p. 11), and that the choice of November 25, 1966 was not proper under the circumstances.

We simply were not impressed with the testimony of defendants' expert witnesses whose depositions were taken by the plaintiff shortly before trial. Both witnesses were unsuccessful bidders, and their testimony is replete with broad conclusions and does not reflect the careful examination of factual data which obviously had to be examined before any valid opinion could be expressed, assuming that front-end loading and the other matters about which they testified are proper subjects for expert opinion, a question we need not decide. Although defendants intimated that they would demonstrate that plaintiff's bid was unreasonably low, they introduced no substantial credible evidence to support such a finding. We have fully stated what we believe are the principles of applicable law in connection with our findings of fact XII and XIII. We make and accept plaintiff's suggested conclusions VII, VIII and IX for the reasons there stated.

*Conclusion X:* Defendants contend that conclusion X should not be accepted because "the record does not disclose what part, if any, of plaintiff's additional construction costs . . . was caused by defendants' alleged acts" (D. Vol. III, p. 11). Basically, that, too, is a factual argument. It is untenable in light of the findings of fact made in this case.

*Conclusion XI:* We reject plaintiff's suggested conclusion XI as unnecessary in light of our earlier discussion of the cases. Acceptance of plaintiff's suggestion would also be inconsistent with our application of the principles of those cases to such items as the "mark ups" and the "15% fee" on Exhibits 9521 and 9916. Defendants' objections in that regard, which direct attention to Mr. Mason's deposition testimony (Mason IV, 90–102) in regard to Exhibits 5804 and 9521 are well taken.

*Conclusion XII:* Defendants' objection to conclusion XII was based solely on the argument that the contract required the plaintiff "to invoice, furnish lien waivers and acknowledge payment in full" (D. Vol. III, p. 13). No legal authority was cited to support that argument and, under the facts as we have found them, defendants' argument is not tenable. On the other hand, plaintiff does not cite any legal authority to support its suggested conclusion XII.

We have ruled numerous cases involving prejudgment interest over the years. Our allowance of prejudgment interest in Triangle Electric Supply Co. v. Mojave Electric Co. (W.D.Mo., 1963), 217 F.Supp. 913, aff'd. sub nom. D & L Construction Co. v. Triangle Electric Supply Co. (8th Cir., 1964), 332 F.2d 1009, was predicated upon principles applicable only to Miller Act cases. In United States v. F. D. Rich Co., *supra*, 439 F.2d at 905, the Court of Appeals cited and distinguished the line of cases illustrated by *Triangle Electric Supply Co.* We conclude that what was said in *F. D. Rich Co., supra*, at 905, and in *Hercules Construction Co., supra*, 385 F.2d at 25, requires that we reject plaintiff's suggested conclusion XII.

*Conclusion XIII:* Defendants contend that principles stated in the leading case of Wiggins Ferry Co. v. O & M Railway, 142 U.S. 396, 12 S.Ct. 188, 35 L.Ed. 1055 (1892), and in that case's progeny are not applicable to this case. Defendants concede that those cases "state well settled legal principles" but argue that those principles "are not applicable to the case at bar" (D. Vol. III, p. 14). Defendants contend that WECo's acts were "explicable" upon some theory other than it had made the contract its own. Defendants' factual argument that "WECo no more adopted this contract than any other owner does any subcontractor's contract" (D. Vol. III, p. 15) is contrary to the facts as we have found them.

Defendants' legal argument tortures the basic rationale of *Wiggins Ferry Co.* The sentence which included the "acts

are only explicable" language was immediately preceded and was in further explanation of the sentence on page 408 of 142 U.S., 12 S.Ct. on page 192 which stated that: "It is not necessary that a party should deliberately agree to be bound by the terms of a contract to which he is a stranger, if, having knowledge of such contract, he deliberately enters. into relations with one of the parties, which are only consistent with the adoption of such contract."

Under the facts as we have ˙found them, we think it clear that WECo deliberately insisted upon direct negotiation with the principal subcontractors and prepared the final forms of contract under which the construction was undertaken, including its assignments of the directly negotiated subcontracts, in order that it would be in a position, if it deemed it necessary, to exercise powers of control which, on paper, had been reserved to Fuller, the prime contractor. On the facts, it must be said that WECo eventually adopted and usurped powers reserved only on paper to the prime contractor for the purpose of pushing particular portions of the job to completion in accordance with WECo's wishes and within periods of time dictated by its judgment and convenience. Suggestions that "The CPM method of scheduling was still in the experimental stage" (D. Vol. I, p. 30) and reliance upon Judge Collinson's comments on the improper use of the computer involved in R. W. Vaught Company v. F. D. Rich Co., (later reported sub nom. United States v. F. D. Rich, *supra*) does not afford a proper legal excuse for the abandonment of the CPM method of scheduling which WECo insisted upon from the time it called for bids on the job.

*Conclusion XIV:* It is not necessary to make this general finding. Plaintiff, of course, wishes to have the statements of Fuller's counsel made in opening statement considered as an admission against both defendants. When we made inquiry of Fuller's counsel in regard to particular statements made in his written opening statement filed prior to trial, Fuller's counsel stated quite frankly that the relationship between WECo and Fuller, as he understood the facts as they would develop at trial, "was not the normal general contractor relationship" (R. 10), and that "there were . . . things over which we [Fuller] had absolutely no control." (R. 11). In the course of the colloquy, plaintiff's counsel clearly indicated that he intended to adduce evidence that there had been a "de facto kind of takeover" by WECo (R. 13). Counsel for WECo, on the other hand, stated his view that "there is no such evidence [of a de facto takeover by WECo] in this record at this stage and we will be on the alert for any such evidence because the only part that Western Electric Company played in the operation was through an owner's representative which the contract expressly provided" (R. 13–14). When the Court asked WECo's counsel whether he contended that "the right for the owner's representative to be present [at meetings of the various trades] means that the owner's representative [rather than the general contractor] shall actually conduct the coordinating" of the work covered by the contract (R. 36), WECo's counsel replied that "our evidence will be that that didn't happen and there was no attempt to do so, and they had no right to coordinate the work and didn't coordinate the work" (R. 36).

It is not necessary to consider whether any of the statements of Fuller's counsel are to be considered as admissions because our findings in regard to the eventual relationship of the parties and the domination of WECo does not rest upon any admission that may have been made by counsel. The Court understood from the statements of all counsel that sharply disputed questions of fact were involved which could only be resolved on the basis of the evidence to be adduced at trial. Our findings of fact, of course, determine those contested issues in favor of the plaintiff. That determination was made independently of any admission which may have been made by counsel. There is not, there-

fore, any need to state any conclusion of law in regard to any admission which may have been made by counsel for any party in this case.

*Conclusion XV:* While defendants do not quarrel with the plaintiff's conclusion suggested, we find it unnecessary to make this abstract conclusion of law because none of our findings of fact are based upon inferences drawn from the fact particular documents may have been lost or even destroyed.

*Conclusion XVI:* Plaintiff's suggested conclusion is a companion conclusion to suggested conclusion XV and focuses specific attention on the loss of a marked logic diagram. As we have stated, our determination of the factual circumstances of this case was not based upon inferences which may be drawn from the loss of a particular piece of evidence. Accordingly, the conclusion is unnecessary.

*Conclusion XVII:* Defendants object to plaintiff's suggested conclusion on the theory that an account was stated in the negotiation and execution of various change-orders and that plaintiff was bound by particular language on the printed forms. Under the factual circumstances, it is impossible to conclude that the parties intended to effectuate an account stated or that plaintiff intended to release defendants from all liability when the printed change order forms were signed.

Defendants' suggested conclusion D VIII, of course, is the converse of plaintiff's suggestion XVII. In support of their suggested D VIII defendants contended that plaintiff "settled with defendants and is estopped under the general law, and in particular the law of Louisiana from any additional recovery" (D. Vol. III, p. 24). This reference to Louisiana law, to which we made an earlier reference, represents the only instance in which any of the parties suggested that the law of Louisiana may differ from the general law applicable to construction contracts. All parties, with this sole exception, implicitly agreed that there were no particular choice of law problems and that general law was applicable to questions presented in this case. Examination of the cases cited by the defendants in support of their suggested conclusion convinces us that the reference to Louisiana law was inadvertent.

Indeed, only two of the cases relied upon by defendants in support of their suggested Conclusion D VIII involved cases which even arose in Louisiana. Autrey v. Williams and Dunlap, (W.D. La., 1965) 210 F.Supp. 491, aff'd. 343 F.2d 730 (5th Cir., 1965), was a Capehart construction case. Such cases are generally controlled by federal law, particularly federal law developed under the Heard and Miller Act cases. The local citation to the Court of Appeals opinion upon which defendants apparently rely, involved an application of a principle of general law stated in Williston on Contracts and did not involve any peculiarity of Louisiana law. Nor does Elite Homes, Inc. v. Youngblood (4th Cir. Ct. App. La., 1970), 242 So.2d 614, 616–617, supports defendants' suggested conclusion. Indeed, it could be said to support plaintiff's argument that defendants are more or less estopped to deny the inferences which could be drawn in regard to the percentage of work performed which plaintiff contends should be drawn solely from the payment of the November 25, 1966 estimate. The other cases upon which defendants rely, including Southwest Engineering Co. v. Reorganized School District R–9 (Mo.App.1968), 434 S.W.2d 743, are equally inapposite and are distinguishable on their particular facts.

Plaintiff's suggested conclusion XVII, under the factual circumstances of this case is generally supported by United States v. F. D. Rich Co., Inc., *supra,* 439 F.2d at 902–903, a case upon which the defendants rely in connection with another point. In that case the prime contractor refused to issue a change-order for extra work performed by a subcontractor under protest. One of the defenses asserted against that claim was the subcontractor's "alleged failure to

follow procedures specified in the sub-contract for making claims thereunder for extra compensation" (439 F.2d at 902). In concluding that and other defenses were not tenable, the Court of Appeals stated that contract provisions establishing procedures for written change-orders which purport to bar all claims for extra or additional work without a written change-order are not to be construed "as a shield barring legitimate claims for extra work performed with the knowledge, consent or acquiescence of the paying party. The notice requirements of such contractual provisions may be waived by the party for whom the work is done" (439 F.2d at 903).

Defendants' objection to plaintiff's conclusion XVII, like its objections to most of plaintiff's conclusions, is basically an argument on the facts. We have determined the relevant facts supporting this conclusion in plaintiff's favor and therefore conclude that defendants' objections are not tenable.

For the reasons stated, it is

Ordered that Appendix A and Appendix B attached hereto and incorporated herein by this reference shall, respectively, be considered as our findings of fact and conclusions of law. The findings and conclusions stated in this memorandum opinion shall also be considered as supplemental findings and conclusions pursuant to Rule 52(a) of the Rules of Civil Procedure. It is further

Ordered that the Clerk, pursuant to Rule 58 of the Rules of Civil Procedure shall forthwith prepare, sign, and enter a judgment for the plaintiff against both defendants in the amount of $739,654.78, together with its costs.

## APPENDIX A

## FINDINGS OF FACT

No.

### I  General Contract Provisions

A.  Natkin and WECo entered into a contract by the terms of which Natkin was to perform the mechanical portion of the construction of WECo's Shreveport Manufacturing Plant.

B.  The Natkin contract was assigned by WECo to Fuller as general contractor, with WECo remaining directly responsible thereunder to Natkin.

C.  The contract was for a fixed contract price of $2,979,261.00, and was to be performed during the period commencing the middle of July, 1966 and ending July 1, 1967, with nine milestone dates for completion of certain designated areas of work.

### II  Critical Path Planning and Scheduling was required by WECo.

A.  Under the various contract documents, it was provided that a Critical Path Method of scheduling would be followed by all parties throughout the job, and the general contractor would be responsible for preparing the original logic diagram therefor, maintaining it current based on designated criteria, and providing computer print-outs as required by said criteria.

B.  The Critical Path Method is a valuable tool on a complex job, saving time and money for owners and contractors.

C.  The Critical Path Plan may become obsolete unless it is kept current.

D.  The 7/15/66 print-out was prepared by Fuller, but was delivered 25 days late and was already outdated.

E.  The 7/15/66 print-out showed the completion date should be extended from 7/1/67 to 7/24/67.

F.  Defendants failed to schedule and control the work in accordance with the sequence set by the Critical Path Plan, thereby delaying Natkin with congestion and material problems.

G.  Natkin had personnel working on and supervising this job, who were qualified in CPM operations.

H.  Natkin and WECo requested preparation of the CPP before and after the 7/15 print-out, and prior to the 12/2/66 print-out.

I. The CPP needed updating prior to 12/2/66

J. The 12/2/66 print-out prepared by Fuller, was delivered 12/21/66 to Natkin, but was only a status report based on original logic diagram.

K. The dates for activities completed prior to 12/2/66 shown on the 12/2/66 print-out are reliable.

L. The 12/2/66 print-out showed a completion date of 9/11/67 instead of 7/24/67; but if properly updated, the date could have been later—not earlier than 9/11/67.

M. After the 12/2/66 print-out, WECo never asked Fuller to update the CPP or to prepare another print-out.

N. After the 12/2/66 print-out, Natkin continued to ask that the CPP be updated, and objected to use of bar graphs in lieu thereof.

O. On January 6, 1967 and for the rest of the job, the defendants abandoned the Critical Path Method of scheduling because Fuller could not keep up with it, and because WECo would not accept the later completion dates it indicated.

P. The CPP needed updating during the job after 12/2/66.

Q. Certain areas not only were not provided for by the CPP after 12/2/66, but also did not have bar graphs prepared for them.

R. Total float may be used to schedule jobs for all contractors; free float belongs to one contractor for scheduling any one activity. Neither total nor free float is to be used for changes.

S. The 11/22/67 print-out was prepared by Fuller, who used a CPM expert for the update. Natkin furnished accurate information for its part of the input.

T. The 11/22/67 print-out was an update showing logical sequence of activities and reporting delays caused by changes.

III WECO's "Invitation to Bid" Documents Included a Simplified Critical Path Diagram (71000C) Showing Anticipated Completion Dates for Phase I Activities, Including Steel Erection; and WECo's Failure to Meet Said Anticipated Dates Constrained and Delayed the Entire Job, Including Natkin's Work.

A. The dates for anticipated completion of Phase I steel erection on 71000C for the areas indicated are:

| | |
|---|---|
| 30–1 | 5/15/66 |
| 30–2 | 5/31/66 |
| 30–3 | 6/15/66 |
| 30–4 | 6/30/66 |
| 30–5 | 7/ 1/66 |
| Bldg. 70 | 7/15/66 |
| Bldg. 60 | 7/15/66 |
| 30–1A | 5/ 1/66 |
| 30–1B | 5/15/66 |
| 30–2A | 6/15/66 |
| 30–2B | 5/31/66 |
| 30–3A | 5/ 1/66 |
| 30–3B | 6/15/66 |
| 30–4A | 6/15/66 |
| 30–4B | 6/30/66 |
| Bldg. 50 | 7/15/66 |
| Bldg. 40 | 8/15/66 |
| Bldg. 20 | 7/15/66 |
| Bldg. 21 | 8/15/66 |
| Bldg. 22 | 8/15/66 |
| Bldg. 41 | 8/15/66 |

B. None of the Phase I steel erection was completed on the dates shown on 71000C, and each area was from 2 to 4½ months late, as shown by the 12/2/66 print-out actual completion dates.

C. 1. Phase I activities governed commencement of certain Natkin Phase II activities.

2. Phase I completion dates were not met by 7/30/66.

3. Building 30, Phase I incomplete and original completion dates ranged from 5/15/66 to 7/1/66.

4. Buildings 50, 60 and 70 incomplete, and original Phase I completion date 7/15/66.

5. Building 40–41, original Phase I completion scheduled 8/15/66.

6. Buildings 20, 21 and 22, original completion dates scheduled 7/15/66 and 8/15/66 for Phase I steel erection.

7. Phase I work continued into November, 1966.

D. Fuller's input for 7/15/66 print-out used different and later predicted

dates than 71000C for Phase I completion, and Fuller's input for 12/2/66 print-out gave actual completion dates, which were later than those predicted on the 7/15/66 print-out.

E. The failure to meet completion dates of Phase I activities anticipated by WECo on 71000C and as predicted by the 7/15/66 print-out delayed Natkin and constrained commencement of many of Natkin's activities.

IV  The Performance of Natkin Labor Met the Standard of Efficiency Anticipated by Natkin up Until the Time it was Adversely Affected By the Actions of Defendants and Other Conditions Which, Under the Contract, Entitled Natkin to an Extension of Time.

A. Natkin labor performed satisfactorily in the early part of the job.

B. The efficiency of Natkin labor began to deteriorate in late 1966 and throughout the rest of the job in 1967 by reason of the acts of defendants and conditions which, under the contract, entitled Natkin to extensions of time.

C. There were more jurisdictional disputes on this job than on the usual job.

V  Natkin had no Manpower Shortage Except for Causes Beyond Its Control Resulting From the Acts of Defendants.

A. There was an availability of men for this job.

B. Natkin planned its scheduled manpower requirements in accordance with the sequence of activities as established by the Critical Path Plan.

C. For work taken in the sequence established by the Critical Path Plan, Natkin had no manpower shortage.

D. When work was taken out of sequence, Natkin encountered manpower shortage.

E. When defendants set completion dates earlier than those established by the Critical Path Plan, Natkin encountered manpower shortage.

F. When WECo's Phase III contractor sought and obtained Natkin's personnel for its cost-plus job, Natkin lost some of its manpower.

G. Natkin had a continuous call for men at the local union hall except in December 1966 and January, 1967 in order to upgrade, and because of WECo's insistence.

VI  WECo Submitted to Natkin Contract Drawings that Appeared to be Complete, but Which Constituted an Incomplete Design.

A. WECo knew in June, 1966 there would be substantial design changes.

B. WECo's Pucci would customarily cease design work when contracts were awarded; but he continued design work on this job after the award on 7/7/66 until spring of 1967.

C. Soliciting bids on incomplete design results in excessive number of work orders and a consequent higher cost.

D. WECo and its suppliers were late in providing information for design completion.

E. WECo could not complete the design by June, 1966 because it was without information from its occupant division.

F. WECo in October, 1966 employed a new engineering firm to help complete the design.

VII  WECo-furnished Equipment and Vendor Drawings Therefor Caused Difficulties and Delay on The Job.

A. Natkin's responsibility for WECo-furnished equipment Natkin was to install commenced immediately on its delivery to the job site.

B. As of October 14, 1966, neither Fuller not Natkin had copies of WECo purchase orders for WECo-furnished equipment.

C. WECo drawings were planned for delivery no later than 8/11/66, but WECo was late in providing certified or approved drawings for WECo-purchased equipment.

D. Some WECo-furnished equipment was delivered two months late.

E. Some WECo-furnished equipment did not match the drawings provided therefor, or the contract drawings.

F. WECo did not furnish adequate drawings for equipment it purchased.

VIII There Were Other Delays Entitling Natkin to Extensions of Time.

A. Delays were caused by inclement weather.

B. Delays were caused by the acts of other contractors.

C. Delays were caused by the acts of owner, WECo.

IX WECo, Both on its Own and Through Fuller, Adversely Affected the Morale and Attitudes of the Natkin Work Force and Caused Delay Through Harassment.

A. Productivity of labor improves over the course of a job, unless there are impeding factors, such as harassment.

B. WECo inspectors took daily head counts of Natkin labor, delaying the Natkin work force, giving the job a cost-plus appearance, and slowing performance.

C. WECo inspectors talked to Natkin men in the field on a daily basis, slowing up the work; and as a result Natkin labor believed the job was cost-plus and developed the bad attitude that their slowdown did not cost Natkin anything.

D. WECo's criticisms of Natkin and announced removal of Natkin from future bidding on WECo jobs, interfered with Natkin supervision and damaged labor morale and productivity.

E. WECo's charges against Seelman and request for his removal were damaging to his morale, to the morale of Natkin's work force, and weakened Natkin's position with union personnel.

F. WECo told Natkin part of its contract would be taken away and given to other mechanical contractors.

G. WECo used threats to Natkin to increase manpower.

H. WECo inspectors interfered with Natkin work.

X The Number, the Inopportune Timing and the Scope of Change Orders Delayed Natkin and Constrained Commencement of Natkin's Activities.

A. Building 20 was delayed by work orders.

B. Building 21 was delayed by work orders.

C. Building 22 was delayed by work orders.

D. Building 30–1A, including south galleries, column lines 1 to 6, was delayed by work orders.

E. Building 30–2, including north galleries, column lines 1 to 6, was delayed by work orders.

F. Building 30–3, including south galleries, column lines 6 to 11, was delayed by work orders.

G. Building 30–4, including north galleries, column lines 6 to 11, was delayed by work orders.

H. Building 30–5, including south galleries, column lines 11 to 19, was delayed by work orders.

I. Buildings 60 and 70, including east galleries, were delayed by work orders.

J. Buildings 40 and 41 were delayed by work orders.

K. Building 42 was delayed by work orders.

L. Cooling tower installation was delayed by work orders.

M. Yard and miscellaneous work was delayed by work orders.

XI WECo and Fuller Compelled Natkin to Accelerate.

A. Acceleration occurred when delays entitling Natkin to a time extension under the contract, were not recognized as such by defendants, and time extension requests were denied by insistence on completion dates irrespective of such delays.

B. Defendants, at WECo's direction, refused to recognize extensions of milestone dates and completion dates set by CPM print-outs.

C. WECo retained sole control over time extensions so that Fuller could not grant a time extension; and WECo did not grant any time extension when properly requested by Natkin.

D. WECo insisted, as then did Fuller, that dates be met for milestone completions, by resort to extra manpower and overtime.

E. WECo and Fuller made threats against Natkin and withheld payments to Natkin in support of their insistence that Natkin add manpower and go on overtime to meet dates earlier than those set by the contract and the CPM.

XII But for the Phase I Delays and the Actions of Defendants Hereinbefore Set Forth, Natkin Would Have Completed its Contract as Amended Within the Time Set by The Contract, Extended as Provided by Said Contract, and Earned at Least the Originally Contemplated Profit.

A. Natkin's original bid price, including its overhead and profit, was reasonably in line with the next lowest bidders.

B. Natkin's bid was accurately prepared, based on contract drawings, material costs and labor costs.

C. On November 25, 1966, Natkin's work on the original contract, without reference to change order work, was 43% complete.

1. WECo, Fuller and Natkin agreed that Natkin's work was 43% complete; and WECo authorized payment to Natkin on that basis and Fuller paid Natkin on that basis.

2. Natkin was approximately 43% complete with respect to labor based on its own calculations for its own business purposes.

3. Natkin was 44½% complete with respect to material installed or fabricated and ready for installation at the installation site on November 30, 1967.

D. As of 11/25/66, on which date all parties accepted Natkin's performance of the original contract as 43% complete, Natkin's cost experience on that work which was comparable to the work remaining to be performed and which constituted 80.8% of the work then complete, was .181 manhours for each standard piping unit, as contrasted with Natkin's original estimate of .20 for each such unit.

XIII Plaintiff's Costs for the Performance of Its Work on this Job were Greater Than They Otherwise Would Have Been After November 25, 1966 By Reason of (1) Failure and Refusal of WECo to Grant Time Extensions to Plaintiff to Compensate for Phase I Delays and Other Delays Resulting From Acts of Defendants Hereinbefore Set Forth, (2) Acceleration, and (3) Extended Period for Completion Because of the Acts of Defendants as Hereinbefore Set Forth.

A. Plaintiff's costs for performing each unit of its work under the contract after November 25, 1966 were greater than they were prior to November 25, 1966.

B. Plaintiff's manhour costs were greater after November 25, 1966 because it was compelled to accelerate when defendants failed and refused to grant time extensions, and there was a resulting impact.

C. Plaintiff incurred additional costs not only by reason of acceleration, but also by reason of the extended period of time required to complete the job.

D. Payments that are due plaintiff for work performed under its contract with WECo, which payments have not been made by Fuller, are $715,567.78, plus retention in the amount of $24,087.00, for a total of $739,654.78.

XV There has not been any Settlement of the Natkin Claim Asserted in this Case.

A. Natkin, by notice to WECo and Fuller, reserved its right to assert claims against WECo and Fuller.

B. Fuller, by notice to WECo, reserved the right of Fuller and Natkin to assert claims against WECo.

C. WECo and Fuller knew Natkin contemplated filing the claim asserted in this case.

## APPENDIX B

## CONCLUSIONS OF LAW

*Conclusion I:* This Court has jurisdiction of this cause under the provisions of 28 United States Code § 1332(a) pertaining to diversity of citizenship of the parties.

*Conclusion II:* The failure of the defendants, or either of them, to perform their contractual obligations renders them liable for the additional costs sustained by plaintiff because of their said failures.

*Conclusion III:* Defendants, by implied contractual duty, were obligated not to impede or hinder plaintiff in the performance of its work under the contract, and violation of said duty renders defendants liable to plaintiff for the increased costs incurred by plaintiff in the performance of its work under the contract which were caused by such violation.

*Conclusion IV:* Plaintiff is entitled to recover its additional costs imposed by failures of defendants which delayed plaintiff's performance, thereby preventing plaintiff from completing its performance within the time contemplated and agreed.

*Conclusion V:* The insistence by defendants, implemented by threats and the withholding of Natkin's progress payment for March, 1967, that Natkin add manpower or go on over-time to complete the work, including change-order work by July 1, 1967, at a time after Phase I and steel erection delays were known to have occurred, constituted an order to Natkin to accelerate.

*Conclusion VI:* The order of defendants to Natkin to accelerate constituted a change under the provisions of Article VIII of the General Conditions of the contract; and therefore Natkin is entitled to recover its additional costs incurred for and as a result of such acceleration.

*Conclusion VII:* Plaintiff's damages must be the certain results of defendants' failures, but need not be certain in amount.

*Conclusion VIII:* Comparing actual costs before and after the point in time that defendants' failures caused damage to plaintiff, provides a reasonable method for computation of damages.

*Conclusion IX:* Plaintiff's evidence of comparing the manhour cost for a standard piping unit before November 25, 1966 with the manhour cost for a standard piping unit after said date, is a logical basis for computing plaintiff's damages pertaining to additional labor costs.

*Conclusion X:* Damages may be computed for additional construction costs, including overtime, additional equipment, and other extra costs of keeping the job open, including overhead.

*Conclusion XIII:* Defendants are jointly and severally liable to plaintiff for the excess costs plaintiff incurred by reason of the wrongful acts or failures of either defendant because:

A. The assignment of the WECo-Natkin contract by WECo to Fuller, made Fuller directly liable as general contractor to Natkin, a subcontractor, for payment to Natkin for work performed under said contract, and Natkin's claim herein is for payment for work performed under said contract as provided therein.

B. By the terms of the assignment provision of said contract, WECo remains liable to Natkin for all payments for such work, if not paid by Fuller, and Natkin's claim herein is for payment for work performed under the contract as provided in said contract,

**36**

for which Fuller has failed and refused to make payment.

C. Natkin's claim herein is for the extra costs incurred by it in the performance of its work under the contract by reason of lost time and delays for which WECo's fault or negligence were responsible, and WECo is directly liable to Natkin therefor under the contract.

D. WECo retained such control of the work and so interfered with the performance of the work under the contract, as to have assumed control thereof; and therefore WECo is responsible for the harmful consequences of its performance as a concomitant of the control so retained and so assumed.

E. WECo adopted the contract.

*Conclusion XVII:* Negotiated settlements of change-orders did not constitute accord and satisfaction of plaintiff's claim because plaintiff did not intend that result, and plaintiff notified defendants thereof both in writing and orally.